638 So.2d 1288 (1994)
Sharon Anderson DAVIS
v.
J. William DAVIS.
No. 92-CA-0367.
Supreme Court of Mississippi.
June 23, 1994.
*1289 B. Ruth Johnson, Jackson, for appellant.
Richard C. Roberts, III, Jackson, for appellee.
En Banc.
JAMES L. ROBERTS, Jr., Justice, for the Court:
J. William Davis ("Bill") was granted a divorce from Sharon Davis on grounds of adultery and desertion. Custody of their son Matthew, then seven years old, was awarded to Bill. Of the $400,000 marital estate, jointly accumulated in its entirety during the eleven-year marriage, the chancellor awarded all but $20,500 to Bill. We affirm the grant of divorce and the award of custody. We reverse that part of the divorce decree concerning division of property, and remand for equitable division of the marital estate.

I.

FACTS AND PROCEDURAL HISTORY
Sharon and Bill were married in October of 1980. Bill, a dentist, and Sharon, a dental hygienist had one child, Matthew, born in June of 1984. Marital discord arose after Matthew's birth. Sharon wished to have another child; Bill was not yet ready. In February of 1990, Sharon moved to the guest bedroom, and the couple ceased to have sexual relations. On June 8, 1990, Sharon moved out of the house, taking Matthew with her.
Sharon filed a complaint for divorce in the Rankin Chancery Court on June 11, 1990, on the grounds of habitual cruel and inhuman treatment, and irreconcilable differences. In March of 1991, Sharon amended her claim to allege desertion as alternative grounds. In November of 1991, Bill counterclaimed for divorce on grounds of desertion, adultery, and habitual drug use.[1]
At trial in December of 1991, Sharon testified that during the marriage, she performed the bulk of the housekeeping chores, as well as cooking, cleaning, clothing of Matthew, and assisting him with his schoolwork. Concerning bills, Sharon stated that Bill paid the house note, utilities, telephone, cable and other "basic household expenses" from his checking account, and that she paid Matthew's tuition and school expenses, clothes, household needs, and groceries from her account, into which she would deposit her salary.
Sharon testified that she had worked as a dental hygienist since 1980, and that she had worked for Bill at the Davis Dental Clinic at least two days a week from 1985 to 1989. However, because Bill discussed their marital problems with patients and staff, it became very stressful to work at the clinic, and she quit. Sharon testified that Bill was "furious" about her ceasing to work, insisting that they needed her income. She returned to work three months later for a dentist in South Jackson, "because Bill was not supplementing our income to take care of the necessities of the household."
Sharon testified that she had brought no assets to the marriage in 1980. She stated that she had assisted Bill in setting up his dental practice in August of 1980, in activities such as painting the building. Additionally, she participated in community activities at Bill's urging, because he felt that the more she was involved in such activity, the more exposure his practice would have in Brandon.
Sharon testified that she was currently working four days a week, earning one hundred and fifteen dollars per day. She stated that she currently paid $435 per month rent. Other expenses included $200 per month for clothing for both her and Matthew, $280 per month for therapy, and $150 per month for medicine. Sharon testified that she had a loan at Deposit Guarantee for $6100; an outstanding balance of $8000 in attorneys fees; and a five hundred dollar loan from her parents. Sharon admitted that she had withdrawn $2000 from Matthew's trust account, of which she was custodian, to pay attorneys *1290 fees. She stated that she had been compelled to do this because it was her only source of money.
Sharon admitted to one incident of adultery, occurring after separation, at a time when Matthew was staying with his father.
Bill testified that he had not been opposed, in principle, to having another child. However, he felt that at that time, the marriage was not ready for additional children. In addition, Bill stated that when he came home at night, Sharon would expect him to "clean the house or wash the dishes, cook supper or whatever needed to be done that in my mind was the reason she was at home that day."
Bill testified that during the time Sharon became extremely depressed in 1989-1990, he had assumed many of her housekeeping responsibilities, although he stated that "there are some things that I just simply don't do."[2] In addition, he took care of Matthew when Sharon could not. Bill testified that during the 1989-1990 school year, when Sharon went back to work in an office in South Jackson, he had dressed, fed and delivered Matthew to school, picked him up after school, fed, and bathed him before Sharon got home from work.
Bill testified that he had not insisted Sharon return to work, but had asked her to, partly because they needed her income, and partly because "she just functioned better when she had some responsibilities outside the house."
Bill testified that at the time he and Sharon married, he owed some money on educational loans; owned a car and some possessions, but "didn't have a net worth." Bill agreed that he had incorporated his business, assigning two thirds of the stock to his parents and keeping one third for himself, but denied that he had done so for the purpose of the divorce litigation. Bill stated that part of the purpose of incorporation was to collateralize $64,000 his parents had loaned him between 1979 and 1984. He admitted that he had not repaid any of the principal or interest, nor had his parents ever demanded payment on these loans. Bill also agreed that one week before the divorce was filed, a "Land Deed of Trust" in the amount of $64,000 was executed between Bill and his parents, (citing three earlier promissory notes), conveying to them a lot on Lake Lorman purchased in 1987.
Bill agreed that a financial statement prepared by him dated September 1981 showed a net worth of $21,000, with notes payable to relatives in the amount of $34,000. He agreed that a statement dated April 1984 showed a net worth of $157,000, and no notes payable to relatives, although he had not paid his parents back any of the $64,000. A statement dated February 1985 showed a net worth of $226,500; a statement dated February 1986 showed a net worth of $289,600, with no loans from relatives; a statement dated September 1986 showed a net worth of $307,700, with no loans from relatives; a statement dated August 1987 showed a net worth of $353,400, with no loans from relatives. Finally, a statement dated January of 1991 showed a net worth of negative $2,535, with a notation of $64,000 payable to relatives. Asked to explain the decrease in his net worth, Bill cited the debts to his parents "not included on the previous financial statements," "some depreciation of equipment," "change in the listing of our joint assets," decrease in the value of autos, a "significant decrease in the cash assets on hand."
Bill denied generally the accuracy of a statement filed by Sharon giving his net worth as $399,960; nevertheless, he agreed that he still owned all items listed on the statement, with the exception of a boat which he had sold for $7000 to pay attorneys fees. He did not dispute the value of each item, except to aver that the house was now assessed at $120,000 instead of $145,000.
Bill testified that he and Sharon jointly owned the marital home; the property on which the dental clinic was located was in his name only. He stated that the reason Sharon's name wasn't on some of the property, including the Lake Lorman property, was because "at the time of the transaction it was the easiest way to do it." Bill acknowledged that the reported business income at the dental clinic reflected the efforts of both him *1291 and Sharon; he agreed that Sharon had made a contribution to the family income, and that in some years, her income was reported as twice as much as the profit from the business.
Bill testified that he had retirement accounts, which had been accumulating for nine years, totalling about $30,000. He agreed that during the time he had been depositing money into these accounts, Sharon had been paying bills at the house for items such as groceries and clothes. However, he stated, he paid the house note, utilities, insurance, charge cards, and automobile insurance. Further, he stated that Sharon could have saved some money rather than spent it. Bill stated that the spending decisions reflected "differences in priorities." He characterized Sharon's expenditures at Wal-Mart and K-Mart, including clothes for Matthew and miscellaneous items for the home, as "discretionary." Bill also testified that Sharon had an IRA with $8000 in it that he had contributed.
Testimony from several Davis Dental Clinic employees, Bill's accountant, and a financial expert who reviewed the Clinic's books and records, strongly suggest that Bill pocketed hundreds of dollars in cash payments from patients at the Clinic, and hid such income from his wife and the taxing authorities.
The court's opinion, filed in January of 1992, granted Bill's motion to dismiss Sharon's claims for divorce, and granted Bill a divorce on grounds of adultery and desertion. The court awarded custody of Matthew to Bill and granted Bill use and possession of the marital home. Sharon was adjudged to have equity of $12,500.00 in the house, and would receive this sum if the house were sold. Sharon was given one car and her IRA worth $8,000; she was awarded no alimony. Each party was held responsible for individual debts and attorneys fees. The parties were ordered to share equally costs of medical insurance and other health expenses for Matthew; Sharon was not ordered to pay child support, "in view of the respective incomes of the parties."

II.

DISCUSSION OF ISSUES
Upon review of the record, we find that the chancellor properly granted Bill a divorce on grounds of adultery and desertion, properly denied Sharon on the grounds she alleged, and properly awarded custody of Matthew to Bill. Therefore, we address only Sharon's assignment of error concerning division of marital property.

THE LOWER COURT ERRED IN FAILING TO EQUITABLY DIVIDE THE PROPERTY ACCUMULATED DURING THE COURSE OF MARRIAGE
Sharon argues that having contributed to the family income during the marriage, she is entitled to a more equitable division of marital property. She draws our attention to Bill's 1) apparent hiding of cash income from the dental clinic; 2) understatement of assets, by claiming the $64,000 debt to his parents which had apparently been forgiven; 3) executing the deed of trust to his parents on the Lake Lorman property in the amount of $64,000, and 4) incorporating his practice and giving 2/3 of the shares to his parents. She argues that the court should have disregarded the conveyances as fraudulent, engineered for the purpose of decreasing the parties' net worth to her detriment.
Bill argues that the deed of Trust executed to his parents on the Lake Lorman property and incorporation of his business, giving two-thirds of the stock to them, was collateralization of their loans to him. Bill characterizes his conduct as "prudent," in order to protect himself and his creditor parents. Bill notes that the chancellor made no finding as to whether he had understated his income or not. Bill argues that under the chancellor's division of property, he retains substantial liabilities offsetting his assets, and that Sharon has "a positive net worth" including $8000 in retirement savings, a car, and household furnishings acquired during the marriage. He further notes that Sharon was not required to assume any costs of child support for Matthew.
*1292 A financial statement of marital assets at the time of the divorce showed the following assets and debts:

 Value Debt
 Home $145,000 $95,000
 Lot Lake Lorman 36,000 [*]
 (purchased 9/87)
 Blazer 5,000
 IRA 30,000
 Mutual Fund 1,000
 Trustmark Savings 2,000
 1988 Bass Boat/Motor/Trailer 4,000
 (sold for $7000 during divorce)
 1980 Aluminum Boat/Motor/Trailer 200
 1983 All Terrain Vehicle 500
 Guns 1,000
 Business Accounts Receivable 19,878
 Personal Loan to Corporation 19,017
 Rankin County Property 19,144
 (Dental Clinic)
 Mortgage 43,779
 Cash Surrender Life Insurance 16,000
 Dental Equipment 60,000
 Building 180,000
 TOTAL ASSETS[**] $541,739
 TOTAL LIABILITIES $138,779
 NET WORTH $402,960

The Chancery Court has authority, where equities so suggest, to order a fair division of property accumulated through joint contribution and efforts of the parties. Flowers v. Flowers, 624 So.2d 992 (Miss. 1993); Brown v. Brown, 574 So.2d 688, 690 (Miss. 1990); Brendel v. Brendel, 566 So.2d 1269, 1273 (Miss. 1990). A spouse is not automatically entitled to an equal division of jointly accumulated property. Brown v. Brown, 574 So.2d at 691; Dillon v. Dillon, 498 So.2d 328, 330 (Miss. 1986). The matter is committed to the discretion and conscience of the chancellor, having in mind all the equities and other relevant facts and circumstances. Jernigan v. Jernigan, 625 So.2d 782 (Miss. 1993); Brown v. Brown, 574 So.2d at 691; Robinson v. Irwin, 546 So.2d 683, 685 (Miss. 1989).
The Court seeks equity by reference to the economic contribution made by each to the acquisition and maintenance of the property, and may not disregard a spouse's economic contributions just because they were not monetary in form. Johnson v. Johnson, 550 So.2d 416, 420 (Miss. 1989); Regan v. Regan, 507 So.2d 54, 56 (Miss. 1987); Pickle v. Pickle, 476 So.2d 32, 34 (Miss. 1985). This Court has stated:
Services and in kind contributions have an economic value as real as cash contributions. In such situations, where one party to the relationship acts without compensation to perform work or render services to a business enterprise or performs work or services generally regarded as domestic in nature, these are nevertheless economic contributions. They are to be valued by reference to the cost of similar services in the marketplace.
Johnson v. Johnson, 550 So.2d at 420 (cites omitted). See also Draper v. Draper, 627 So.2d 302 (Miss. 1993).
Bill and Sharon were married for eleven years. For the first eight or nine *1293 years of marriage, Sharon did all or the majority of the cooking, cleaning, washing, other housework, and caring for Matthew. In addition to contributing her own salary to the marital assets, Sharon participated in activities which Bill felt would build his practice. At the outset of the marriage, by Bill's admission, the couple had no net worth. At the time of the divorce, the marital assets totalled around $400,000. Sharon was granted $12,500 equity in the house, $8000 in savings, the household furnishings (value unknown) and a car (value unknown). The remaining approximately $380,000 of the jointly acquired marital estate was awarded to Bill.
The chancellor evidently did not find Bill's conduct, in transferring the Lake Lorman property to his parents, giving them two-thirds ownership in his practice, and otherwise understating his assets, to be inequitable.[3] We defer to the chancellor's judgment on this issue; absent manifest error, this Court will not reverse a chancellor's findings in cases of domestic relations. Crow v. Crow, 622 So.2d 1226, 1227 (Miss. 1993); McAdory v. McAdory, 608 So.2d 695, 699 (Miss. 1992); Culbreath v. Johnson, 427 So.2d 705, 707 (Miss. 1983).
Nevertheless, it is evident from the law cited above that the chancellor ignored or undervalued Sharon's contribution to the jointly accumulated marital assets. It cannot be determined from the record whether, as Sharon suggests, the inequitable distribution of marital assets can be attributed to the chancellor "punishing" her for her act of adultery. In any event, attention is directed to Lenoir v. Lenoir, 611 So.2d 200 (Miss. 1992), in which a divorce was granted to the husband on grounds of adultery. This Court reversed an award to the husband of all three real properties acquired during the marriage, and remanded for equal distribution of the properties or their value. We stated:
Although this Court certainly does not condone June Lenoir's actions, equity demands that she receive her just share ... (a)side from sheer punishment, there is no compelling reason not to partition all three marital properties. This Court is moving away from the harsh effects of punishment in domestic cases towards the just principles of fairness.
Lenoir v. Lenoir, 611 So.2d at 204 (Miss. 1992).

III.

CONCLUSION
The chancellor did not err in his grant of divorce or award of custody. However, his division of marital property was not equitable. The chancellor evidently ignored or undervalued Sharon's financial and in-kind contributions to the acquisition of marital property. This part of his judgment should be reversed and remanded for further findings on each party's assets, and an equitable division of jointly accumulated marital property.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED FOR FURTHER FINDINGS.
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN, PITTMAN, BANKS and SMITH, JJ., concur.
McRAE, J., dissents with separate written opinion, joined by DAN M. LEE, P.J.
McRAE, Justice, dissenting:
I agree with the majority's decision granting the divorce and awarding custody of the minor child to his father. However, the finding that the chancellor failed to make an "equitable" distribution of the "marital property" appears to be based solely on the majority's subjective considerations without regard for the facts of the case. Because the majority today plays "super chancellor," I dissent.
Sharon Davis seeks a "more equitable distribution" of the couple's marital property. Her appeal and the majority's disposition of the case raise questions about what, if any, *1294 assets she may be "entitled" to share. Before a division of property can be made, it is necessary to know what assets might be subject to distribution and how they are to be valued. Further, decisions regarding periodic alimony and child support should not be rendered until after the division of any marital property is made. Only then, especially when income-producing assets are involved, can an equitable determination of either party's need for alimony or resources available to pay alimony be made. However, if we are to merely accept the majority's apparent position that equity is in the eyes of the beholder, we are left without grounds upon which to find a chancellor to be manifestly wrong or even to identify those errors made.
Child support obligations, likewise, can be determined only after the marital property is divided. Whether the non-custodial spouse receives the bulk of the parties' assets must be considered when determining his or her ability to pay child support. Furthermore, where, as in the case sub judice, both parties work, both incomes should be taken into account.
In other jurisdictions, statutes specify the assets which may be subject to division between spouses in the event of a divorce. Even where there is a presumption that all property acquired during a marriage is "marital property," subject to distribution, legislatures have carved out exceptions. These include property acquired prior to the marriage; property acquired through gift, devise or descent; property acquired by separate assets; property acquired from a prior divorce decree; and property excluded by a prenuptial or other valid agreement. See e.g., Colo. Rev. Stat. Ann. § 14-10-113 (1993); Md. Code Ann., Family Law § 8-201 (1984); Wis. Stat. Ann. § 767.255 (1986). Other statutes provide, in addition, exceptions for the income and/or increase in value of separate property; sometimes with the caveat that any increase in value is not attributable to the efforts of both parties. See e.g., Ark. Code Ann. § 9-12-315 (amended 1993); Del. Code Ann. 13 § 1513 (1993); S.H.A. 750 ILCS 5/503 (1993) (formerly Ill. Rev. Stat. ch. 40, para. 503); Ky. Rev. Stat. Ann. § 403.190 (1986); Me. Rev. Stat. Ann. tit. 19, § 722-A (1979); Mo. Rev. Stat. § 452.330 (1988).
In other jurisdictions, statutes distinguish between marital property and separate or non-marital property. Statutory definitions of separate or non-marital property encompass most of the same exceptions to the presumption of marital property enumerated in other states. See e.g., Fla. Stat. Ann. § 61.075 (amended 1991) (distinguishing also marital and non-marital liabilities); Minn. Stat. § 518.54 (amended 1993); N.C. Gen. Stat. § 50-20 (amended 1987); N.M. Stat. Ann. § 40-3-1 (1978) (distinguishing separate, community and quasi-community assets and liabilities); N.Y.Dom.Rel.Law § 236 (1986); Ohio Rev. Code Ann. § 3105.17.1 (Supp. 1993); Tenn. Code Ann. § 36-4-121 (1991); Va. Code Ann. § 20-107.3 (1990) (the most detailed and complex of any state's statute); W. Va. Code § 48-2-1 (1992). Should this Court seek to define marital assets in the interests of assisting chancellors in the division of property, the statutes adopted by other states should prove instructional.
The record indicates marked discrepancies in Bill Davis' net worth figures, as well as in a variety of conveyances to his parents, which may or may not have been made to repay a $64,000.00 loan. See, Blount v. Blount, 231 Miss. 398, 95 So.2d 545 (1957) (in wife's suit against husband and father alleging conveyance made to avoid alimony, burden on defendants to show existence of bona fide debt). Nevertheless, the majority provides us with a list of "marital assets" at the time of the divorce, ranging from the marital dwelling to the building and equipment used for Davis' dental practice, a professional corporation. Without knowing which, if any, of these assets are properly considered marital property and how they are to be valued, it cannot be said that a fair or equitable distribution was or was not made. Indeed, this is one of the increasing number of cases which illustrates the need for expert testimony on the valuation of certain assets.
Nowhere in the list of purported "marital assets" are we provided with any indication that Sharon Davis made specific contributions to the acquisition or appreciation of any of these assets. The opinion, however, suggests *1295 that "[i]n addition to contributing her own salary to the marital assets, Sharon participated in activities which Bill felt would build his practice." Slip op. at 11 (emphasis added). While we know that she worked and still works as a dental hygienist, we are provided with no evidence that any specific assets are attributable to her salary. Without a clearer picture of whether she did, indeed, make a substantial contribution to the assets of the marriage, it cannot be said that the chancellor erred in not awarding her a greater share of the property acquired by the parties.
The majority acknowledges that it cannot be determined from the record whether the chancellor used the "inequitable" division of assets to "punish" Sharon for her adulterous behavior, but notes Lenior v. Lenior, 611 So.2d 200, 204 (Miss. 1992), for the proposition that fairness, and not punishment, is the goal of marital property division. This begs the question of whether we might be so sympathetic were the husband, not the wife, the adulterous party.
The majority today plays "super chancellor" without providing any guidance to the chancellor below. It proclaims that the matter of property division is "committed to the discretion and conscience of the chancellor, having in mind all the equities and other relevant facts and circumstances." Slip op. at 10 (citing Jernigan v. Jernigan, 625 So.2d 782 (Miss. 1993); Brown v. Brown, 574 So.2d 688 (Miss. 1990); Robinson v. Irwin, 546 So.2d 683, 685 (Miss. 1989)). However, what subjectively may be equity in the eyes of one chancellor may be inequity to another, or to this Court. Perhaps we should say instead, "the matter is committed to the discretion of the chancellor provided he has gazed into the majority's crystal ball and determined just what, subjectively, it would do." Accordingly, I dissent.
DAN M. LEE, P.J., Joins this Opinion.
NOTES
[1] Sharon was prescribed various medicines, including antidepressants, tranquilizers and sleeping pills.
[2] In particular, Bill noted "I don't know that I've ever cleaned a bathroom."
[*] $64,000 deed of trust to Bill's mother and father, dated June 1, 1990.
[**] including proceeds for sale of bass boat.
[3] See Rudder v. Rudder, 467 So.2d 675 (Miss. 1985) and Smith v. Smith, 429 So.2d 588 (Miss. 1983), in which this Court reversed and remanded for reconsideration of alimony, where evidence showed indicated the husbands' "purpose to disburse the assets acquired during ... marriage to hinder the trial court in its determination of equitable support for the wife."