# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 94-CA-01152-SCT

*DIANNE J. LOVE*

*v.*

*RANDY S. LOVE*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/10/94 |
| TRIAL JUDGE: | HON. PAT WISE |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | DON A. MITCHELL |
| ATTORNEY FOR APPELLEE: | JESSIE L. EVANS |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 2/6/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 3/4/97 |

**BEFORE SULLIVAN, P.J., McRAE AND ROBERTS, JJ.**

**SULLIVAN, PRESIDING JUSTICE, FOR THE COURT:**

¶1. From a grant of divorce on irreconcilable differences we are presented with the question of whether or not the chancellor made manifest error when she did not award equitable distribution of the husband's retirement account.

¶2. We find that the chancellor was not in error and affirm her judgment.

¶3. Randy and Dianne Love were married on August 4, 1984 in Washington County, Mississippi. Dr. Love had been practicing as a dentist for three years and was working at the Department of Corrections at Parchman. His earnings were approximately $32,000.00 to $33,000.00 a year. Ms. Love was attending Louisiana State University and working on a doctorate degree. She testified that while she was in school in Baton Rouge, Dr. Love only gave her small amounts of money occasionally, and at other times loaned her money. She paid for her living expenses and tuition out of a scholarship and a fellowship that included a stipend.

¶4. In October of 1984 Dr. Love began working at Delta Health Center in Mound Bayou, Mississippi, where he earned $39,000.00 per year as a starting salary and $45,000.00 as his ending salary. In 1986, Ms. Love moved to Jackson to work on her dissertation and seek employment. She began her career as a lab assistant at Jackson State University in 1986, earning about $16,000.00 to

$17,000.00, and was still receiving a stipend from LSU in the amount of $833.00 per month. Ms. Love lived in an apartment in Ridgeland, and Dr. Love lived in an apartment in Mound Bayou.

¶5. On the weekends Dr. Love came to Ridgeland. Dr. Love paid for his living expenses in Mound Bayou and also helped with Ms. Love's living expenses in Ridgeland by paying a portion of the rent, contributing half of the cost of the furniture, and helping Ms. Love pay for her car, a Nissan Maxima.

¶6. In 1988 Dr. Love moved to Madison to work at Yazoo Leake Family Health Center in Canton, for a starting salary of $45,000.00. The couple began living together for the first time after being married for four years. They built a home in Jackson, Mississippi. The mortgage payments started out at $1,158.00 and were $1,178.00 at the time of the divorce.

¶7. Dr. Love said that the parties agreed that he would make the mortgage payments out of his salary, and that she would pay for utilities, insurance, and groceries out of her paycheck, because his salary was larger than hers. The furnishings were purchased jointly, and the couple also bought rental property with funds from a joint savings account that Dr. Love testified was generated primarily from his salary. Dr. Love testified that before they hired a maid, the couple had shared household cleaning duties. Ms. Love to the contrary said that Dr. Love never did any cleaning, that they did not eat out, and that she cooked and did the laundry. Ms. Love's sister, Dorothy Johnson, also testified that Ms. Love was responsible for the cooking, cleaning, and laundry until the couple hired a maid to clean once a week.

¶8. At the end of 1988, the Loves decided to close their joint savings account because of an argument between the Loves. Dr. Love's version was that he was trying to save money, and that Ms. Love was an compulsive shopper. Ms. Love said they closed the joint savings account because of a letter from another woman with whom she thought Dr. Love was having an affair. The Loves kept a joint checking account that Ms. Love used for her personal use, and when she paid bills out of that account, Dr. Love would reimburse her. In fact, both parties characterized their finances as working like a partnership, with each reimbursing the other for expenses.

¶9. One year before the couple's marriage, in 1983, Dr. Love began investing part of his salary into retirement accounts. At the time of trial, Dr. Love's annual salary was $58,500.00, $9,500.00 of which he placed into his retirement account through his employer every year. The total on his retirement accounts at the time of the divorce was approximately $114,000.00, with about half of the money invested in mutual funds through Pioneer Western and the other half in an annuity with Metropolitan Life. The doctor also made investments into mutual accounts and growth funds for savings purposes totaling about $7,000.00. All of these retirement accounts, mutual fund accounts, and growth funds were held solely in his name, because he believed Ms. Love would withdraw money from them to shop since she had previously withdrawn money from their joint savings. Dr. Love testified that Ms. Love never showed much interest in making investments or in saving money. Ms. Love admitted that she did a lot of shopping with QVC, but classified the expenditures as household items as well as jewelry and exercise equipment.

¶10. Ms. Love had her own state retirement plan through her job and an annuity with the Equitable, with a combined monthly investment of about $589.76, totaling approximately $21,000.00. On the date of the divorce she was working as a professor of marine biology at Jackson State University, earning a base yearly salary of $35,970.00, supplemented by grants, and in 1993 her income totaled

around $40,000.00. She had a contract to begin work at Central State University in Ohio on July 1, 1994 at a yearly salary of $65,000.00, with the opportunity to continue receiving grant money.

¶11. In March of 1993, Dr. Love moved out of the marital home. He testified that for four or five months after the separation he became involved in gambling in Vicksburg and would sometimes lose as much as four or five hundred dollars a month. Dr. Love also made a personal loan to a friend in the amount of $20,000.00, and the friend had since filed for bankruptcy. He had also withdrawn approximately $14,000.00 from his mutual fund accounts a short time before the separation and $900.00 since the temporary hearing and order, but had deposited more than the $900.00 that he withdrew during that time period.

¶12. At the close of the testimony, the chancellor issued a bench ruling based upon her findings of fact and conclusions of law. She denied alimony for Ms. Love, awarded her half of Dr. Love's mutual funds as valued prior to the separation at approximately $21,000.00, denied Ms. Love any share of Dr. Love's $114,000.00 in retirement investments, granted Ms. Love title to the Nissan Maxima in her possession, required each party to pay their own attorneys' fees. Court costs were assessed to Dr. Love, and he was allowed to remove Ms. Love as beneficiary on his life insurance policies.

## I.

## EQUITABLE DISTRIBUTION OF THE HUSBAND'S RETIREMENT ACCOUNT.

¶13. Dr. Love began investing in his retirement account prior to the marriage, but both parties testified that they planned to enjoy the benefits of the retirement planning together. Dr. Love had accumulated approximately $114,000.00 in retirement accounts and approximately $21,000.00 in savings, while Ms. Love accumulated approximately $21,000.00 in retirement savings. In light of Ms. Love's contributions to the marriage and the couple's retirement planning, Dr. Love's retirement account was marital property which should have and was considered by the chancellor for purposes of an equitable distribution. *Ferguson v. Ferguson*, 639 So.2d 921, 933-34 (Miss. 1994).

¶14. Equitable distribution is governed by the guidelines set out by us in *Ferguson*, 639 So.2d at 928. These guidelines include: (1) economic and domestic contributions by each party to the marriage, (2) expenditures and disposal of the marital assets by each party, (3) the market value and emotional value of the marital assets, (4) the value of the nonmarital property, (5) tax, economic, contractual, and legal consequences of the distribution, (6) elimination of alimony and other future frictional contact between the parties, (7) the income and earning capacity of each party, and (8) any other relevant factor that should be considered in making an equitable distribution. *Id*.

¶15. We have repeatedly held that in making an equitable division of the marital property, the chancellor is not required to divide the property equally. *Trovato v. Trovato*, 649 So.2d 815, 817-18 (Miss. 1995); *Davis v. Davis*, 638 So.2d 1288, 1292 (Miss. 1994); *Dudley v. Light*, 586 So.2d 155, 161 (Miss. 1991); *Brown v. Brown*, 574 So.2d 688, 691 (Miss. 1990).

¶16. Applying these factors to this case, it cannot be said that the chancellor was manifestly wrong in her distribution of the Loves' marital assets. She gave Ms. Love a share of the investments made by Dr. Love in mutual funds and retirement accounts, because he had invested in those accounts to the detriment of the marriage partnership. However, the chancellor did not give Ms. Love an equal share

of those investments. Instead the chancellor awarded Ms. Love one-half of the accumulated mutual funds, leaving Dr. Love the entirety of his retirement accounts. In *Ferguson* we confirmed that the wife was entitled to a portion of her husband's retirement savings based upon her domestic and economic contributions to the marriage, and because she had no separate retirement account of her own. *Ferguson*, 639 So.2d at 933-34. Ms. Love did have her own retirement savings, was expected to begin a new job with a higher salary than Dr. Love, and could not be classified as a homemaker like the wife in *Ferguson*. Based upon the respective earning capacities of the Loves, the respective spending versus saving habits of the couple, and the fact that neither can be said to have made a significant domestic contribution to the marriage, we cannot find that the chancellor committed manifest error in refusing to grant Ms. Love an equal share in Dr. Love's retirement accounts.

## CONCLUSION

¶17. Chancellor Wise set out findings of fact and conclusions of law in support of her award to Ms. Love. The chancellor's decision was not an abuse of discretion, and is affirmed.

**¶18. AFFIRMED.**

**LEE, C.J., PRATHER, P.J., PITTMAN, BANKS, McRAE, ROBERTS, SMITH AND MILLS, JJ., CONCUR.**