IN THE SUPREME COURT OF MISSISSIPPI
NO. 97-CA-00289-SCT

*PATRICIA (DAVIS) SELMAN*

*v.*

*A. W. SELMAN*

| | |
|---|---|
| DATE OF JUDGMENT: | 1/30/97 |
| TRIAL JUDGE: | HON. DON GRIST |
| COURT FROM WHICH APPEALED: | MARSHALL COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | DAVID LEE ROBINSON |
| ATTORNEY FOR APPELLEE: | PRO SE |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | REVERSED AND REMANDED - 10/8/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 10/29/98 |

**BEFORE SULLIVAN, P.J., BANKS AND WALLER, JJ.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. This case is before the Court on appeal from a division and distribution of marital property incident to a divorce. We must determine whether the chancellor's findings of fact and conclusions of law were sufficient to support the court's equitable distribution of the marital property. Because appellee has filed no brief and because we cannot say with confidence that there has been no error in certain aspects of the judgment of the chancellor, we reverse and remand this matter for additional proceedings.

**I.**

¶2. The Appellant, Patricia Davis Selman, and the Appellee, A.W. Selman, were married on February 10, 1973. A.W. moved out of the marital home on or about February 19, 1996. On June 27, 1996, A.W. filed a Complaint of Divorce on the grounds of habitual cruel and inhuman treatment and irreconcilable differences. Patricia initially contested the divorce, but the parties later agreed to a divorce on the grounds of irreconcilable differences, pursuant to Miss. Code Ann. § 93-5-2 (1994). On October 28, 1996, the parties filed their Agreement and Consent to Divorce on the Grounds of Irreconcilable Differences. Pursuant to this agreement, they specifically submitted for determination

by the chancellor the issues of child custody and support; alimony; the equitable division and distribution of marital property, including responsibility for the payment of the debts of the parties; attorneys' fees; and court costs. A trial was held before the chancellor on October 28, 1996.

¶3. There are three children from the marriage: Patrice, born September 17, 1970; Antonios (Tony), born August 25, 1976; and April, born March 18, 1983. April lives with her mother in the marital home. Tony, twenty years old at the time of the trial, is mentally impaired and is also living with his mother, who is his sole means of support. Patrice also moved back with her mother around July of 1996. Patrice has her own child, Brittany, who was five years old at the time of trial. Patrice works two jobs, but she and her mother both testified that she does not pay rent and that her income does not go toward helping with the household bills.

¶4. Testimony established that the marital home was acquired in June of 1979 for a purchase price of $39,995.00. A.W. testified that Patricia provided no portion of the funds necessary for the initial purchase of the home. Both parties agreed there remained an outstanding mortgage balance of $30,198.80, while the assessed value of the home was $40,720.00. Equity in the marital home at the time of the trial, therefore, was approximately $10,500.00. The monthly payment on the house is $447.58. A.W. made these mortgage payments during the marriage, and continued to pay them up until the time of the trial. Patricia testified, however, that at certain times in the past the payments had fallen behind and that she had taken out loans to catch them up. She also stated that she bought furniture and other items for the house, and that her retirement account had been drawn out completely in December of 1995, in the amount of $5000.00 to expend on the home, and that the only retirement funds she had began to accrue in February of 1996. At the time of the trial the house was in need of roof repair at an approximate cost of $500.00.

¶5. Both Patricia and A.W. worked throughout the marriage. Patricia stated that she and A.W. contributed jointly for groceries, family support, and other expenses during the marriage. Value of the couple's household furnishings was placed at approximately $5,000.00.

¶6. A.W. had worked as a restaurant manager at Kentucky Fried Chicken (KFC) for nineteen years, and was earning approximately $26,000.00 per year when he quit his job to go into the church on June 3, 1996. He had no retirement program from his prior employment at KFC. He testified that at the time of the trial he was a minister earning only a gross monthly income of $700.00; after taxes he estimated his net monthly income at $650.00. He stated that he earned approximately $200.00 of this gross monthly income from substitute teaching, but that this work is "unpredictable." The remaining $500.00 of his declared monthly income is typically gathered from offerings at the church's revival services. The church pays him no official salary.

¶7. A.W. took possession of a 1985 Oldsmobile which he valued at $1,500.00. This car is debt-free but is currently not running. He also took possession of a 1992 Oldsmobile he valued at $8,500.00. He testified that there was an outstanding debt of $461.00 on this car. Patricia testified that A.W. also took the couple's 1995 income tax return check of approximately $900.00 and that she had received no portion of the money. A.W. had an outstanding balance on a personal loan of $3,000.00, for which the monthly payment is $186.00. He stated at trial that he was staying with his brother and paying rent of $250.00 per month, but that this was a temporary situation and that he would have to find another place to stay.

¶8. Patricia works as an investigator for the Holly Springs Police Department, and earns approximately $25,000.00 per year. Her gross monthly salary is $2,064.00 and her net monthly income is $1,531.31. She has a vehicle provided by the city which she drives when on duty. She also has the ability to earn additional outside income working as a security guard, although opportunities to earn this extra income are sporadic.

¶9. Patricia estimated her monthly expenses at approximately $2,400.00 per month. This includes the mortgage payment, $300.00 per month in food and household supplies, $150.00 per month in electricity, $100.00 for telephone service, $100.00 for laundry and cleaning, $115.00 for April's school, and other miscellaneous expenses. Included also in this amount is an automobile payment of $330.00 per month for a 1995 Mazda 626 that Patricia bought in May of 1996 after A.W. left the house. There is a balance owed on this car of $19,800.00. Insurance on it costs $112.75 per month. Finally, Patricia's expenses include installment debt totaling approximately $3,600.00. This total consists of a $700.00 debt to J.C. Penney for April's school clothes, a $2,000.00 loan taken out by Patricia to help Patrice with her overdue bills, and a $900.00 balance owed to Whirlpool for furniture and carpet for the house. The monthly payments on these three debts total $293.00.

¶10. The chancellor issued a bench ruling at the close of trial, and this was subsequently condensed into a Final Decree of Divorce and entered on January 30, 1997. The chancellor found that A.W.'s earnings were considerably less at the time of trial than they had been during the marriage. He also stated in his ruling that Patrice's contribution toward the support of her own child and to Patricia's household is "limited." The chancellor awarded the couple joint legal custody of April and Tony, with Patricia having primary physical care, custody and control. The court ordered A.W. to pay $140.00 per month in child support until Tony reached the age of twenty-one. However, the chancellor's ruling is ambiguous as to whether the entire $140.00 payment is to cease when Tony reaches the age of majority. The chancellor awarded "the use and benefit of the house and the personal property of the parties unto Mrs. Selman until such time as April reaches majority, at which time the Court orders the house to be sold, the profits in the house after payment, the sale be split between the parties." A.W. was ordered to fix the roof of the home. Patricia was ordered to make the house payments while she was living in it with April. The chancellor also awarded half of Patricia's retirement account to A.W., from the period of February 1996 until the divorce in October of 1996.

¶11. Patricia filed her Notice of Appeal from the chancellor's ruling on February 26, 1997. A.W. has filed no brief in response to Patricia's appeal in this case.

## II.

¶12. This Court employs a limited standard of review on appeals from chancery court. "If substantial credible evidence supports the chancellor's decision, it will be affirmed." *Reddell v. Reddell,* 696 So. 2d 287, 288 (Miss. 1997) (citing, *Carrow v. Carrow,* 642 So. 2d 901, 904 (Miss. 1994)). The Court will not interfere with the findings of the chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied. *Id.* (citing *Carrow*, 642 So. 2d at 904).

¶13. In the present case, A.W. Selman did not file a brief in response to Patricia's appeal. This Court has held that "'[f]ailure to file a brief is tantamount to confession of error and will be accepted as such unless the reviewing court can say with confidence, after considering the record and brief of appealing party, that there was no error.'" *Reddell,* 696 So. 2d at 288 (quoting *Dethlefs v. Beau*

***Maison Dev. Corp.,*** 458 So. 2d 714, 717 (Miss. 1984)). *See also **State v. Maples,*** 402 So. 2d 350, 353 (Miss. 1981). Automatic reversal is not required where the appellee fails to file a brief. The appellant's argument "should at least create enough doubt in the judiciousness of the trial court's judgment that this Court cannot 'say with confidence that the case should be affirmed.'" ***Muhammad v. Muhammad,*** 622 So. 2d 1239, 1242 (Miss. 1993) (quoting ***Griffin v. Breckenridge,*** 204 So. 2d 855, 855 (Miss. 1967)). Where the appellant's brief makes out an apparent case of error, however, this Court is not obligated to look to the record to find a way to avoid the force of the appellant's argument. ***Dethlefs,*** 458 So. 2d at 717 (citing ***Westinghouse Credit Corp. v. Deposit Guar. Nat'l Bank***, 304 So. 2d 636 (Miss. 1974)).

## III.

¶14. Patricia asserts that the chancellor abused his discretion, was manifestly wrong, clearly erroneous and applied an erroneous legal standard in the division and distribution of the marital property and in failing to assign the marital debts. She argues that the chancellor made no findings of fact or conclusions of law relative to the eight primary factors set forth in ***Ferguson v. Ferguson,*** 639 So. 2d 921, 928 (Miss. 1994). She asserts that the chancellor divided the marital home as well as Patricia's retirement funds equally, but did not address the issues of alimony or marital debts which had been specifically presented to the chancellor for determination. In so dividing the marital home and the retirement funds, Patricia claims that the chancellor applied a legal standard of equal division, which is manifestly wrong and clearly erroneous.

¶15. This Court has never held that a chancellor is not permitted to divide marital property equally where he deems it equitable to do so. In ***Hemsley v. Hemsley,*** 639 So. 2d 909 (Miss. 1994), this Court stated:

> We define marital property for the purpose of divorce as being any and all property acquired or accumulated during the marriage. Assets so acquired or accumulated during the course of the marriage are marital assets and are subject to an equitable distribution by the chancellor. We assume for divorce purposes that the contributions and efforts of the marital partners, whether economic, domestic or otherwise are of equal value.

***Id.*** at 915. It is true that there is no automatic right to an equal division of jointly-accumulated property in divorce cases. *See, e.g., **Love v. Love,*** 687 So. 2d 1229, 1232 (Miss. 1997); ***Trovato v. Trovato,*** 649 So. 2d 815, 818 (Miss. 1995); ***Davis v. Davis,*** 638 So. 2d 1288, 1292 (Miss. 1994); ***Draper v. Draper,*** 627 So. 2d 302, 305 (Miss. 1993); ***Dudley v. Light,*** 586 So. 2d 155, 161 (Miss. 1991). Where the parties have made equal contributions throughout the marriage, however, it is certainly equitable that the marital property should be more or less evenly divided. "The matter is committed to the discretion and conscience of the chancellor, having in mind all the equities and other relevant facts and circumstances." ***Davis,*** 638 So. 2d at 1292. *See also **Brown v. Brown,*** 574 So. 2d 688, 691 (Miss. 1990). The question in the present case is whether the chancellor's equal distribution of the joint property in these circumstances undermines this Court's confidence in the fairness of that distribution.

¶16. Equitable distribution is governed by the guidelines set out by this Court in ***Ferguson,*** 639 So. 2d at 928. These guidelines include: (1) substantial contributions to the accumulation of the property, including economic and domestic contributions by each party to the marriage, (2) expenditures and

disposal of the marital assets by each party, (3) the market value and emotional value of the marital assets, (4) the value of the nonmarital property, (5) tax, economic, contractual, and legal consequences of the distribution, (6) elimination of alimony and other future frictional contact between the parties, (7) the income and earning capacity of each party, and (8) any other relevant factor that should be considered in making an equitable distribution. *Id. See also Love,* 687 So. 2d at 1231-32.

¶17. In the present case, the principal marital asset was the couple's house. The chancellor ordered that Patricia begin making the house payments after the divorce until such time that April, who was thirteen at the time of trial, reaches the age of majority. This ruling requires Patricia to make the payments for approximately eight years while she lives in the house, after which she will be required to sell the house and split the profits with A.W. Patricia argues that "the Chancellor did not, as required by *Ferguson,* make a determination of contributions to the acquisition of the house." She also asserts that "[t]he Chancellor made no allowance for the value of Mrs. Selman's retirement funds which were invested in the house, which, according to Mrs. Selman's testimony, represented the entire amount of the equity in the residence."

¶18. The relevant considerations here are the first and the seventh factors from *Ferguson*. The chancellor stated in his bench ruling that both parties worked throughout the marriage, and that before A.W. quit his job at KFC the parties "made and earned approximately the same amount of earnings." It is apparent from the record testimony that both parties made roughly equivalent contributions to the acquisition of the marital home throughout the marriage. A.W. nominally made most of the payments, and continued to do so even after he left the house in February of 1996. Patricia certainly made her own contributions during the twenty-three-year marriage, both economic and non-economic, which deserve consideration. Most notable is the $5,000.00 from her retirement funds which she says she invested in the home.

¶19. This Court has declared that an equal distribution of proceeds from the sale of a marital home is an abuse of discretion where it is shown that the contributions by one spouse are disproportionately large. *See, e.g., Trovato,* 649 So. 2d at 817-18 (equal distribution of proceeds from marital home not equitable where wife made eighty percent (80%) of payments on home and husband was not making child support payments consistently). *See also Bullock v. Bullock,* 699 So. 2d 1205, 1211 (Miss. 1997). It cannot be said in the present case, however, that either party's contributions to the acquisition of the house significantly outweigh those of the other. It is simply not true, moreover, that Patricia's investment of $5,000.00 from her retirement funds equals the entire amount of equity in the home.

¶20. The *Trovato* Court also remarked that where one spouse has the benefit of living in the home, that spouse may not "necessarily [be] entitled to a share of the proceeds proportionate to the payments she made." *Id.* at 818. In other words, the spouse who lives in the marital home gains a benefit which must be taken into consideration. As the chancellor remarked in his bench ruling, after the divorce Patricia enjoys the use and benefit of the home and the couple's personal property. Thus, the fact that she is paying the mortgage during her time in the house after the divorce does not upset the equity of an even split of the proceeds when the house is sold.

¶21. Under these facts, the chancellor's equal distribution of the proceeds from the marital home is

not an abuse of discretion. This is especially true in light of A.W.'s diminished income and future earning capacity.

¶22. Patricia argues next that the chancellor erred in awarding half of her retirement funds to A.W. Patricia had drawn her retirement savings down to zero in December of 1995, since she had been "unemployed for a while" and needed to "take care of some bills." This is the $5,000.00 that Patricia says she invested in the home. Consequently, her present retirement funds began to accrue at $149.64 per month from February of 1996, which apparently is when she began working for the Holly Springs Police Department. The chancellor awarded a money judgment to A.W. for half the amount of retirement funds accrued between February of 1996 until October 28, 1996 when the divorce was granted. While no figure was stated by the lower court, the amount due to A.W. under this arrangement would total approximately $675.00, and was to be paid to A.W. within sixty (60) days.

¶23. Patricia argues that this award is not equitable since the funds began to accrue at the time that A.W. left the marital home, and thus "Mr. Selman made no contribution to the accumulation of these funds." Patricia further states that the chancellor made no findings of fact or conclusions of law relative to his treatment of the retirement funds, and when prompted by her attorney to reconsider his ruling on this point the chancellor stated only that "[t]he law says that until they are divorced everything is on the table."

¶24. To the extent that retirement funds have accumulated during the marriage, those funds are marital property which should be considered by the chancellor for purposes of an equitable distribution. *See, e.g., **Bullock,*** 699 So. 2d at 1211; ***Love,*** 687 So. 2d at 1231; ***Hemsley,*** 639 So. 2d at 913-14; ***Ferguson,*** 639 So. 2d at 934. "When separate plans for each spouse are not in existence, it is only equitable to allow both parties to reap the benefits of the one existing retirement plan, to which both parties have materially contributed in some fashion." ***Id.***

¶25. Here, however, while the marriage had not legally terminated, the relationship out of which equitable distribution arises had ended some months earlier. There is no justification in equity to allow A.W. to share in this meager accumulation.

¶26. Patricia next asserts that the chancellor failed to address other major items of marital property, specifically the automobiles and the distribution of the $900.00 income tax refund. She also argues that the chancellor failed to apportion or divide the marital debts (exclusive of the debts on the residence), even though the parties specifically requested that the chancellor make a division of marital debts.

¶27. A.W. testified that he took possession of two automobiles, presumably around the time of the separation in February. One of these is a 1985 Oldsmobile which does not run but which A.W. nevertheless valued at $1500.00. The other is a 1992 Oldsmobile he valued at $8500.00. While both of these cars are titled in A.W.'s name, they were acquired during the marriage and are thus subject to equitable distribution unless A.W. can show they are separate property. *See, e.g., **Hemsley,*** 639 So. 2d at 914. Patricia also testified that A.W. took the couple's 1995 income tax return check of approximately $900.00 and that she had received no portion of the money. A.W. did not dispute this claim. The chancellor failed to comment upon these assets either in his bench ruling or in his final decree.

¶28. The chancellor also failed to make express findings of fact or conclusions of law in regard to the marital debt. Patricia's expenses include installment debt totaling approximately $3,600.00. This total consists of a $700.00 debt to J.C. Penney for April's school clothes, a $2,000.00 loan taken out by Patricia to help Patrice with her overdue bills, and a $900.00 balance owed to Whirlpool for furniture and carpet for the house. The monthly payments on these debts total $293.00. As for A.W.'s liabilities, he has a balance of $461.00 on his 1992 Oldsmobile, and a $3,000.00 outstanding loan balance from First State Bank, for which the monthly payments are $186.00. There was no testimony as to what this personal loan was used for.

¶29. This Court stated in *Ferguson* that "[t]o aid appellate review, findings of fact by the chancellor, together with the legal conclusions drawn from those findings, are required." *Ferguson,* 639 So. 2d at 929. The chancellor's findings in the present case could have better equipped this Court to review the disputed issues. However, this Court will reverse and remand only where the failure to make sufficient findings of fact and conclusions of law constitute manifest error. *Sandlin v. Sandlin,* 699 So. 2d 1198, 1204 (Miss. 1997). This Court finds that the chancellor's failure to make findings of fact and conclusions of law, as set out above, was not error.

¶30. In her final argument, Patricia asserts that she should have been awarded alimony. Since she admits that A.W. could not afford to pay alimony because of his diminished income, she argues that the chancellor should have divested A.W. of any interest in the marital home and treated his share of any equity in the marital home as lump sum alimony to Patricia in order to give Patricia some measure of financial security.

¶31. The factors to be considered by the chancellor in awarding alimony are as follows: (1) the income and expenses of the parties (2) the health and earning capacities of the parties (3) the needs of each party (4) obligations and assets of each party (5) length of the marriage (6) the presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care (7) age of the parties (8) the standard of living of the parties, both during the marriage and at the time of the support determination (9) tax consequences of the spousal support order (10) fault or misconduct (11) wasteful dissipation of assets by either party and (12) any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support. *Parsons v. Parsons,* 678 So. 2d 701, 703 (Miss. 1996); *Ethridge v. Ethridge,* 648 So. 2d 1143, 1146 (Miss. 1995); *Armstrong v. Armstrong,* 618 So. 2d 1278, 1280 (Miss. 1993).

¶32. Patricia asserts that the chancellor should have awarded her alimony considering the length of the marriage, the presence of minor children in the home, her financial needs, her earning capacity and her absence of fault in the divorce. While there is no doubt that Patricia could use more money, the reality is that A.W. has little means by which to provide her with alimony. A.W. has a subsistence-level income and a seriously reduced earning capacity. Patricia, on the other hand, has a steady job by which she earns almost three times the gross pay that A.W. now earns. A.W.'s living expenses must also be taken into account, especially considering that Patricia has use and benefit of the marital home. Nevertheless, the chancellor should have expressly laid out his finding of fact and conclusions of law in regard to alimony, although he did recite the factors relating to alimony.

**IV.**

¶33. As a final matter, the chancellor's bench ruling and final decree are so ambiguous in regard to his

award of child support as to constitute plain error. This Court may consider such error even though not argued by the appellant on appeal. *See, e.g., **Chamblee v. Chamblee,*** 637 So. 2d 850, 866 (Miss. 1994).

¶34. In his bench ruling, the chancellor recognized the statutory guidelines for setting awards of child support based upon the percentage of gross income earned by the supporting spouse. These guidelines provide that where there are two children in the home that are due support, there is a rebuttable presumption that twenty percent (20%) of the supporting spouse's gross income will be awarded. Where only one child is due support, the amount of this presumption is fourteen percent (14%). *See* Miss. Code Ann. § 43-19-101(1) (1993). These amounts apply unless the court makes a "specific finding on the record that the application of the guidelines would be unjust or inappropriate in a particular case as determined under the criteria specified in Section 43-19-103." Miss. Code Ann. § 43-19-101(2) (1993).

¶35. The chancellor first declared that A.W. would be ordered to pay fourteen percent (14%) of his gross income of $700.00, but erroneously calculated the resulting amount at $140.00. The court further found that "it is necessary to vary from the guidelines in that it was the desire of both parties for April to continue attending the school that she is presently in." He then ordered "that there be an additional $35 per month payment from Mr. Selman to Mrs. Selman above and beyond the guidelines." When the initial calculation error was corrected, the chancellor stated that the amount of support would stay at $140.00, since that was twenty percent (20%) of A.W.'s income and was consistent with the guidelines. He remarked, however, that "the Court is still going to Order the additional amount of support as previously Ordered due to Tony's present situation, his mental state, and April attending the school which costs $115 per month." When asked for clarification concerning the $140.00 payment, the chancellor spoke as if the entire amount of this payment would discontinue at the time Tony reached majority. April, however, is still a minor, is younger than Tony and is living with her mother. Thus, even after Tony reached the age of majority, fourteen percent (14%) of A.W's gross income would still be proper under Miss. Code Ann. § 43-19-101. Moreover, it is unclear whether the chancellor considered the "additional" $35.00 per month to be included in the $140.00 figure, since the chancellor's final decree stated only that "the Plaintiff shall pay the sum of $140.00 per month to the Defendant as child support for use, benefit, support and maintenance of the children." Neither does this language make clear whether the entire additional amount was to continue past Tony's majority for the benefit of April, although this was suggested in the chancellor's bench ruling.

¶36. In order to prevent future friction between the parties regarding the meaning of the chancellor's ruling, he should clarify his order on remand to provide for child support of at least fourteen percent (14%) of A.W.'s earnings after Tony reaches majority. Miss. Code Ann. § 43-19-101 (1993). Also, any additional amounts awarded as a departure from the statutory guidelines should be expressly stated in the revised order in accordance with Miss. Code Ann. § 43-19-103 (1993). Finally, the whole matter of child support must be revisited. We note that A.W. has an earning capacity of roughly three times his present earnings. His diminished earnings are the result of voluntary choice. While his religious calling may be laudable, his obligation to provide adequate support remains. We direct the chancellor to give due consideration to A.W.'s earnings capacity when establishing the level of child support. To the extent that support is fixed at an amount which deviates substantially from that capacity we suggest that the court require regular financial reporting including tax returns and

employers reports so that the court can make appropriate and timely upward adjustments to the child support level ordered.

**V.**

¶37. For the foregoing reasons, the judgment is reversed and this case is remanded to the chancery court.

¶38. **REVERSED AND REMANDED.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., McRAE, ROBERTS, SMITH AND WALLER, JJ., CONCUR. MILLS, J., NOT PARTICIPATING.**