**IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI**

**NO. 2024-CA-00320-COA**

**PATRICK THORNTON**                                                          **APPELLANT**

**v.**

**ANDREA THORNTON**                                                          **APPELLEE**

DATE OF JUDGMENT:          02/08/2024
TRIAL JUDGE:                        HON. SHEILA HAVARD SMALLWOOD
COURT FROM WHICH APPEALED:  LAMAR COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:   RISHER G. CAVES
ATTORNEY FOR APPELLEE:     S. CHRISTOPHER FARRIS
NATURE OF THE CASE:         CIVIL - DOMESTIC RELATIONS
DISPOSITION:                AFFIRMED - 12/16/2025
MOTION FOR REHEARING FILED:

**EN BANC.**

**BARNES, C.J., FOR THE COURT:**

¶1.     In this domestic relations case, the Chancery Court of Lamar County granted Patrick "Shane" Thornton (Shane) a divorce from Andrea Thornton on the ground of uncondoned adultery. The chancery court granted the parties joint legal and physical custody of their two sons and divided the marital property. Shane, the owner of several restaurants, was awarded full ownership of them, as well as the restaurant debts, which were substantial. Regarding the division of marital personal property, the chancery court found that because there was no evidence presented or request for it, each party would retain the personal property in his or her possession.

¶2.     On appeal, Shane raises issues related to child custody and property division. He argues the chancery court erred in ordering joint legal and physical custody because of the

parties' inability to communicate, cooperate, or co-parent effectively.[1] Shane also claims that the chancery court's property division was inequitable when his debt obligations were compared with Andrea's debt obligations. Finally, Shane contends the chancery court improperly failed to divide specific personal property items.[2] Finding no reversible error, we affirm.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶3. Shane and Andrea were married in May 2011 and separated in August 2022. Two sons were born of the marriage in 2017 and 2020, respectively. At the time of trial, the boys were six and three years old. The parties initially lived in Waynesboro, Mississippi, where

---

[1] Post-appeal, the parties have continued to litigate in the chancery court. Andrea retained new counsel. In May 2024, Shane, as well as Andrea, filed petitions for modification of custody in the chancery court, each requesting sole custody. A multi-day trial on the matter was scheduled. Due to this outstanding matter, Andrea filed a motion to suspend appellate briefing, which the supreme court denied.

Now before us, Andrea's two-page brief makes no meaningful arguments, stating "[i]t would be a waste of time and limited financial resources" to address the propriety of the chancery court's judgment due to the pending issues in that court. Her brief, filed in February 2025, states that two days of trial have been completed, with three more days scheduled. On the property distribution issues, Andrea merely argues that Shane "confessed error." Shane filed a motion to strike Andrea's brief, which the supreme court denied.

As to child custody, we will treat Andrea's appellee brief as if she filed no brief on the issue because she made no substantive argument. "When child custody is at issue, 'this Court is compelled to review the record' despite the appellee's failure to file a brief. We do this because 'when matters on appeal touch the welfare of a minor child, . . . regardless of whether a party filed a brief, this Court will reach the merits of the issues in this appeal, though we proceed unaided by a brief from the appellee." *Briggs v. Weary*, 396 So. 3d 1246, 1254-55 (¶35) (Miss. Ct. App. 2024) (citations omitted). Given this matter deals with children, we must review it. Additionally, the determination of the merits of child custody is not a "waste of time" because the appellate disposition will set the standard for any modification action.

[2] While Andrea filed a cross-appeal, she makes no substantive argument on her cross-appeal.

2

Shane worked as a church youth pastor. After two years of marriage, Shane paid for Andrea to return to school, where she obtained her licensed practical nursing degree. Andrea began working as a nurse while Shane began a career in the restaurant industry. He formed the company "PAST LLC" to own the restaurants he acquired. Shane was highly involved in running his restaurants—he cooked, developed menus, met with food vendors, as well as hired, trained, and managed staff.

¶4. In 2013, Shane purchased his first restaurant, Parker's Seafood Market, in Waynesboro, which he operated for approximately four years. Then, around 2017, the couple moved to Ellisville, Mississippi, and Shane opened a new restaurant, the Blue Crab Grill, in Laurel, Mississippi. In 2018, Shane purchased the Café La Fleur restaurant in Laurel. In 2019, Shane moved the Blue Crab Grill to a different location in Laurel. Next, Shane took over an existing company, SHRIMP LLC, which began operating the Blue-Eyed Butcher, a shop Shane developed, in Waynesboro.[3] Around this time, Shane opened a second Blue Crab Grill in Waynesboro on the same property as the butcher shop. Additionally, Shane became a joint owner of Warthorn LLP, which owns rental property in Purvis, Mississippi. Shane earned other money day-trading on the stock market.

¶5. In early 2021, the couple moved to Hattiesburg, Mississippi, where they purchased a residence at 109 Tidewater Road, in the upscale Canebrake subdivision. Shane's sister also lived in the subdivision. Around this time, the Thorntons' marriage became turbulent and began to deteriorate. Andrea quit her nursing job to be a stay-at-home mother, against

---

[3] According to Shane, the butcher shop is not owned by PAST LLC but, rather, SHRIMP LLC.

Shane's wishes. Shane complained that Andrea was spending too much money and drinking too much. Also in 2021, Shane made approximately half a million dollars day-trading on the stock market, utilizing an investment platform and account through Robinhood Securities. The couple spent a portion of the funds on vehicles, remodeling their house, and trips.

¶6. On August 19, 2022, Andrea claimed that Shane became physically violent during a fight in front of the children. During the fight Andrea claims Shane broke a high chair, called her names, and grabbed her. Shane denied the fight was physical but claimed that Andrea threatened to punch Shane and called him a "p\*\*sy." On that date, the couple officially separated; however, Shane continued to reside in the marital home until October 2022. The record also showed the parties continued to attend family gatherings and church together during this time.

¶7. In September 2022, Andrea filed for divorce on the grounds of habitual cruel and inhuman treatment, including domestic spousal abuse or, alternatively, irreconcilable differences. Andrea requested ownership of the marital home, an equitable division of the marital property and debt, alimony, child support, and sole physical custody of the children, with joint legal custody. Andrea also requested a temporary restraining order against Shane and temporary spousal support. In response, Shane counterclaimed for divorce on the same grounds and requested sole legal and physical custody of the children.

¶8. In October 2022, the record details a series of altercations between the couple. One day Andrea became enraged when Shane told her parents, from whom she was estranged,

about the pending divorce. In response, Andrea threw all of Shane's possessions on the front porch. The next morning, Shane came back to the house, allegedly to pick up their younger son for a soccer game, and another altercation ensued in front of the children. Shane began video recording the boys, asking them questions about whether their basic needs were being met, to Andrea's annoyance. Shane's sister arrived and joined in the video recording. Andrea testified that she called the police, as well as subdivision security, to remove Shane's sister from the property. Name-calling ensued between the parties before Andrea and a friend left the house with the children. A few days later, Shane discovered Andrea had unilaterally instructed the daycare that Shane was not to pick up their older son, which maddened him. When both parents and Shane's sister arrived at the daycare, a fight broke out over possession of the child. Again, police were called to the scene. Andrea left with the child and moved into a friend's RV for ten days with both children, not informing Shane of their whereabouts.

¶9. In October 2022, the chancery court entered an emergency order. The court temporarily granted the parties joint custody of the children and entered a detailed visitation schedule. Andrea was awarded temporary use of the marital home, with Shane's remaining responsible for the marital debt. The court ordered Shane to pay Andrea $2,000 a month in temporary child support and ordered the parents to refrain from fighting in front of the children or harassing one another. The chancery court appointed a guardian ad litem. Based on the guardian's recommendations, the court directed the parties to attend individual therapy and co-parenting sessions. In November 2022, the chancery court entered a

5

temporary order, enjoining the parties from destroying property or dissipating assets, among other matters. The court also designated Rob King, a licensed certified public accountant, as an expert in business evaluation. The court ordered King to value Shane's businesses and evaluate his actual income.

¶10. In December 2022, Andrea went on a "girls' trip" to New York City for four days. Instead of having Shane keep the children, Andrea hired a babysitter and presented Shane with a bill for $360. During this time, Shane also reentered the marital house without Andrea's permission and took $5,000 cash. Shane also repeatedly put trackers on Andrea's vehicle and hired a private investigator to follow Andrea.

¶11. In early 2023, Andrea filed the first of several motions for contempt against Shane, alleging he was not complying with the temporary orders. Specifically, she claimed Shane was not paying her vehicle note, the court-ordered fees for King, child support and related child expenses, the court-ordered therapist, and the homeowners' association fees. Further, there was a disagreement between the parties about where the children would attend school, as well as a concern that Shane was dissipating assets. After a hearing, the chancery court ordered Shane to pay his outstanding fees and child support arrearage and determined the schools in which to enroll the children.

¶12. In April 2023, Shane amended his counterclaim for divorce to include the ground of uncondoned adultery. At a hearing in August 2023, after Andrea confessed to adultery, the chancery court awarded Shane a divorce based on that ground.[4] In August, October, and

---

[4] It is unclear from the record when Andrea's extramarital affair began.

November 2023, the chancery court heard additional testimony on the remaining issues of child custody and support, equitable distribution, alimony, attorney's fees, and Andrea's contempt claims.

### Chancery Court's Opinion and Final Judgment

¶13.    In February 2024, the chancery court issued a comprehensive opinion and final judgment, making the following determinations.[5]

### Child Custody

¶14.    Regarding child custody, the court provided a detailed and thoughtful analysis of the *Albright*[6] factors, finding three factors favored Shane: parenting skills; the children's home, school, and community record; and religion, personal values, or lifestyle.   Andrea was favored in no factors, and the other factors were neutral.   The court concluded that it would be in the best interest of the children to award the parties joint legal and physical custody. The court entered a custodial schedule, where the parents alternated weekly physical custody.

¶15.    In making this ruling, the chancery court explained that both parents were fit, but they did "not possess a current ability to co-parent and communicate effectively."   Yet the chancery court noted that this Court had "affirmed a chancellor's award of joint legal and

_____

[5] The chancery court ruled on the following matters that Shane did not appeal.  While child support of $960 per month was awarded to Andrea, alimony was not awarded because she received a significant financial settlement due to the marital assets.   Shane agreed to maintain health insurance for the children, and the court ordered the parties to divide equally the children's medical, extracurricular, and school expenses.   Additionally, Andrea's pending claims for contempt against Shane were denied for lack of proof.

[6] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

physical custody to parents whose acrimonious divorce included struggles to effectively communicate" in *Watts v. Watts*, 99 So. 3d 751, 761 (¶28) (Miss. Ct. App. 2012). Here, the chancery court explained:

> An acrimonious divorce can bring out the worst behavior in litigants seeking to gain an advantage in a contested custody case. *Yet here, it is in the children's best interest to spend extended time with each parent. The parties have been under a shared custody arrangement since November 2022 and there has been no testimony that would suggest the children are adversely affected by this arrangement. . . .* The parties do live near each other. Thus, the Court finds joint legal and physical custody should be considered, particularly since the parties have been traveling under a joint legal and joint physical custody arrangement for over a year.

(Emphasis added). The court acknowledged that awarding joint legal and physical custody obligates the parties to confer on certain issues. Because "there was a history of disputes about the children's health care and educational needs," the court allocated final decision-making authority on these matters to Shane.

### Division of Marital Property

¶16. Regarding the equitable division of marital assets, the chancery court found the parties' financial interdependence was significant. The court determined "the line of demarcation for the accumulation of marital assets" was August 16, 2023—the date that Andrea confessed to adultery in court. The chancery court reviewed the parties' financial disclosure statements, as well as fourteen admitted trial exhibits, and determined the marital assets subject to division and their value, which totaled $538,958.

¶17. The chancery court found the marital assets subject to division included (1) the marital home at 109 Tidewater Road; (2) a home Shane purchased post-separation at 90

Windwood Trace that had no equity;[7] (3) PAST LLC, which had a value of zero; (4) Warthorn LLP; (5) the Robinhood Securities account; (6) Andrea's 401(k) with Pine Belt Dermatology from a former nursing job; (7) Shane's State Farm Roth IRA; (8) both parties' Tesla vehicles, which had no equity; (9) a Chevrolet truck used for PAST LLC's catering, which had no equity; and (10) personal checking accounts. The chancery court valued and divided the marital assets as follows:

| Division of Marital Assets: | Shane | Andrea |
| --- | --- | --- |
| 109 Tidewater Road | $143,054 | $143,054 |
| 90 Windwood Trace | $0 | $0 |
| PAST LLC | $0 | $0 |
| Warthorn LLP | $13,872.50 | $13,872.50 |
| Robinhood Securities | $83,250 | $83,250 |
| SF IRA/Pine Belt 401K | $20,845 | $16,000 |
| 2021 Tesla/2022 Tesla | $0 | $0 |
| Chevrolet catering truck | $0 | $0 |
| Personal checking accounts | $2,000 | $300 |
| Totals: | $263,021.50 | $256,476.50 |

The difference in marital asset values was the parties' retirement and checking accounts.

¶18. The chancery court found the marital debt subject to division totaled $3,382,244 and noted the parties have "significant debt incurred largely to operate PAST LLC," totaling $2,162,152. The PAST LLC debt included six loans at various banks, two credit card

---

[7] The chancery court noted that no documents were presented on this asset's value. Shane testified the note on this post-separation asset was an "interest only note"; thus, the court found no equity had accumulated.

balances, the note on the catering truck, two notes Shane's father secured, and a state tax lien of $32,572. The remaining marital debt included (1) the mortgage on the marital home at 109 Tidewater Road; (2) the mortgage on the home at 90 Windwood Trace; (3) the notes on Shane's and Andrea's Teslas; (4) one-half of a loan for Warthorn LLP due to Shane's one-half ownership interest; (5) an Internal Revenue Service (IRS) lien of $135,000 for personal taxes owed in 2021;[8] (6) and two credit card debts attributed to Shane personally. The chancery court valued and divided the marital debt as follows:

| Division of Marital Debt | Shane | Andrea |
| --- | --- | --- |
| PAST LLC | $2,162,152 | |
| 90 Windwood Trace | $375,000 | |
| Tesla vehicles notes | $41,270 (Shane's) | $44,000 (Andrea's) |
| Warthorn LLP | $239,510 (½) | |
| IRS | $101,250 (75%) | $33,750 (25%) |
| Credit Key | $18,492 | |
| Discover Credit Card | $7,928 | |
| **Totals:** | **$2,825,847** | **$77,750** |

¶19. In coming to these distributions of assets and debts, the chancery court performed a detailed analysis of the *Ferguson*[9] factors. For the first *Ferguson* factor, the court noted the testimony and tax returns reflected that Shane provided the majority of the financial contribution towards the accumulation of marital assets. The court found his income was

---

[8] The parties' personal federal tax liability for 2021 was $135,000. The court assessed twenty-five percent of the liability to Andrea ($33,750) and seventy-five percent to Shane ($101,250).

[9] *Ferguson v. Ferguson*, 639 So. 2d 921 (Miss. 1994).

10

significant, and Andrea's income as a nurse was less, although the court recognized she largely contributed indirectly by being a homemaker. The court found both parties contributed to the family's instability as follows. Both parties were profane towards one another. Andrea had trouble staying within a budget and "struggled" with Shane's work schedule. Shane complained of Andrea's spending habits and the time she spent with friends on various trips. The court noted that Andrea made some "dramatic . . . allegations" about Shane that proved unfounded, but she also admitted that Shane was a good father. The court acknowledged Andrea's adultery as a cause of marital disharmony and instability.

¶20. On the second *Ferguson* factor of dissipation of marital assets, the court noted that Andrea removed $20,000 from the PAST LLC business account in order to pay her attorney $15,000. Andrea also testified that she removed another $5,000 but returned it. Andrea testified that Shane continued to incur debt against the business during the divorce proceedings, impacting the value of PAST LLC. The chancery court acknowledged it "placed significant financial obligations on Shane to try to maintain the status quo" by requiring him to pay Andrea $2,000 per month in child support temporarily, which "placed a great deal of financial hardship" on Shane. The court concluded that there was no proof that any purchases or expenditures by the parties rose to the level of dissipation of assets.

¶21. For the remaining *Ferguson* factors, the court found the assets had more economic than emotional value to the parties. Neither party presented evidence of tax consequences. The court stated that while "Andrea had greater financial need based on the disparity of the incomes," Andrea could "earn a higher income with her nursing degree" than she had in the

11

past. The court concluded that property division would "make it possible to avoid periodic alimony payments" as well as for the parties to live independently of one another.

¶22. The chancery court based its distribution of marital assets and debts upon the *Ferguson* factors and observation of the parties' behavior and demeanor at trial. The court made the following specific findings on the division of marital assets and debts.

### PAST LLC

¶23. The value of this asset was disputed by the parties. PAST LLC owns all three of Shane's restaurants. At trial, King was accepted as an expert in accounting and business valuation. His valuation of PAST LLC was based on the "net asset value method," which he maintains is the proper method for divorce actions. This method determined the value of a business by taking the fair market value of the assets, less liabilities, with no consideration of goodwill. King relied on a combination of the business's bank statements, loan statements, appraisals, property taxes, and the 2021 depreciation schedule. He determined PAST LLC to have an actual negative value of ($123,874), or a fair market value of "none." The court accepted King's business valuation and awarded Shane full ownership of the assets as well as the debts.

### Marital House - 109 Tidewater Road, Hattiesburg

¶24. The chancery court found the largest marital asset was the marital home, with an equity of $286,108 based upon an appraisal of $645,000, and an equal division of the equity of $143,054. Because neither party could buy the interest of the other, the court ordered the house to be sold and the parties to split the proceeds. Until then, Andrea was allowed to

remain in the home with the parties equally sharing in the mortgage payments.

### *Robinhood Securities Account*

¶25. The value of the Robinhood Securities investment account was $425,000 as of August 16, 2023. There were two loans from Shane's father pledged against the account for PAST LLC totaling $258,000, leaving an equity value of $166,500. The court acknowledged that while this asset had been volatile throughout the instant proceedings, decreasing in value, the unencumbered value of the securities should be equally divided, thereby awarding Andrea $83,250.

### *Warthorn LLP*

¶26. Shane and another individual own an apartment complex in Purvis through this partnership. The chancery court determined the partnership's value at $295,000, less debt totaling $239,510 as of August 2023, leaving an equity value of $55,490. Shane's half of this value was $27,745.

¶27. In response, Andrea filed a motion for reconsideration, which the court denied. She requested the court reconsider granting Shane final decision-making authority for the children. Andrea contended that the parties had only minimal disputes about the children's healthcare and education. Andrea also disputed the court's line of demarcation for the accumulation of marital assets and requested the court obtain further evidence on the value of the residence at 90 Windwood Trace, among other matters. Shane appealed, and Andrea cross-appealed.[10]

---

[10] Andrea's new counsel filed a notice of cross-appeal but, as stated earlier, did not make any meaningful arguments in her brief; we deem the cross-appeal abandoned.

## STANDARD OF REVIEW

¶28. "We adhere to a limited standard of review when analyzing a chancellor's determinations in domestic-relations matters." *Gilmer v. Gilmer*, 297 So. 3d 324, 331 (¶13) (Miss. Ct. App. 2020). "Chancellors are afforded wide latitude in fashioning equitable remedies in domestic relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record." *Henderson v. Henderson*, 757 So. 2d 285, 289 (¶19) (Miss. 2000) (citing *Hammett v. Woods*, 602 So. 2d 825, 827 (Miss. 1992)). "In other words, '[the reviewing court] will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied.'" *Id.* (citing *Bell v. Parker*, 563 So. 2d 594, 596-97 (Miss. 1990)). Conclusions of law are reviewed de novo. *Gilmer*, 297 So. 3d at 331 (¶13). As previously stated, while Andrea did not make any meaningful arguments in the appellee brief she filed with this Court, because child custody is at issue, we must address it. *See Briggs*, 396 So. 3d at 1254-55 (¶35).

## ANALYSIS

### I.   Joint Custody

¶29. Shane argues the chancery court improperly awarded joint legal and physical custody of the children when the court explicitly found the parents had difficulty communicating, cooperating, or co-parenting. Shane requests that this Court reverse the chancery court's custody decision and render him judgment granting him sole legal and physical custody.[11]

_____

[11] In Andrea's complaint for divorce, she requested sole physical custody and joint legal custody, while in Shane's counterclaim for divorce, he requested sole physical and

14

¶30. Mississippi courts have recognized that "[w]hen substantial animosity exists [between parents], a joint custody arrangement may not be in the best interests of the children." *Cuccia v. Cuccia*, 90 So. 3d 1228, 1236 (¶22) (Miss. 2012) (citing *Rutledge v. Rutledge*, 487 So. 2d 218, 220 (Miss. 1986)). Moreover, it is well established that "unless the parents are capable of sharing joint custody cooperatively, it is incumbent upon a chancellor not to award joint custody." *Crider v. Crider*, 904 So. 2d 142, 147 (¶13) (Miss. 2005). But, the *Crider* court also repeatedly stated "[t]his is for the chancellor to determine as he or she is in the best position to evaluate the credibility, sincerity, capabilities, and intentions of the parties." *Id.* Mississippi courts have "clearly declared time and time again that the polestar consideration in all cases dealing with child custody and visitation is the best interest and welfare of the child." *Id.* at 144 (¶6) (citations omitted).

¶31. The chancery court noted "[a]n award of joint physical and legal custody obligates the parties to exchange information concerning the health, education and welfare of the minor child. . . ." Miss. Code Ann. § 93-5-24(5)(e) (Rev. 2021). The chancellor was all too aware of the acrimony in this divorce proceeding but cited *Watts*, where we affirmed the award of joint legal and physical custody to parents whose struggles were similar to the instant case—both parties alleged manipulative behavior and damaging incidents against each other. *Watts*, 99 So. 3d at 761 (¶28). Here, the court found both parents fit but acknowledged they did not possess a *current* ability to co-parent effectively. However, she still found it "*in the children's best interest* to spend extended time with each parent."

legal custody. By trial, however, Shane called for sole physical custody but was agreeable to joint legal custody. On appeal, Shane again requests sole physical and legal custody.

15

(Emphasis added). The chancellor noted there had been a shared custody arrangement since November 2022 (over a year) "with no testimony the children were adversely affected by this arrangement." Further, the parties lived close to one another. Thus, she found joint legal and physical custody proper. Even so, the chancellor recognized the parties' "history of disputes" on matters such as the children's health care and education. To solve this potential problem, she awarded Shane final decision-making authority on these matters. We can find no error in this ruling.

¶32. Shane cites *Crider* for the supreme court's first announcement of an alleged "prohibition" against awarding joint custody when parents are unable to cooperate. He also cites other cases that allegedly support his contention, both within and outside Mississippi, and lists numerous instances in the record where Andrea and Shane have disagreed or behaved badly. He concludes that the chancery court "misapprehended" the law. We disagree.

¶33. *Crider*, also cited by the chancery court, did not "prohibit" but cautioned the chancellor not to award joint custody if the parents were incapable of cooperating.[12] *Crider*, 904 So. 2d at 148 (¶13). The *Crider* court also maintained that the chancellor was in the best position to determine if parental cooperation was feasible and in the best interest of the

---

[12] *Crider* dealt with an issue of first impression—if the statute on child custody, Mississippi Code Annotated section 93-5-24(2) (Rev. 2021), prohibited a chancellor from awarding joint custody in irreconcilable-difference-divorce proceedings unless both parties specifically requested it. *Crider*, 904 So. 2d at 143 (¶1). The supreme court held the statute did not prohibit the chancellor from awarding joint custody based on the best interest of the child. *Id.* As Shane himself states in his brief, *Crider* held that "the best interest of the child overrides whether or not either parent consents to joint custody or not."

child, which is always the polestar consideration. *Id.*

¶34.     Shane cites to a footnote in the Mississippi Supreme Court's *Waller v. Waller*, 754 So. 2d 1181 (Miss. 2000), that "the cardinal criterion for an award of joint custody is . . . mutual ability to cooperate . . . [for] the child's welfare." *Id.* at 1184 n.1 (citing Vitauts M. Gulbis, Annotation, *Propriety of Awarding Joint Custody of Children*, 17 A.L.R.4th 1013, 1016 (1982)).  However, this treatise and many cases Shane cites are from other jurisdictions (California, Illinois, Iowa, Oregon, Vermont, and others), not Mississippi.  Further, his Mississippi authority is distinguishable.[13]  Most importantly, what Shane fails to cite is our law that regardless of the parents' ability to cooperate, the best interest of the child is paramount.  *See Crider*, 904 So. 2d at 144 (¶6).

¶35.     Shane also claims the chancery court's "reliance" on *Watts* is "misplaced."  There, this Court affirmed the chancellor's award of joint legal and physical custody even though the parents' acrimonious divorce included allegations of manipulative and damaging

---

[13] Shane cites *Cuccia v. Cuccia*, 90 So. 3d 1228 (Miss. 2012); *Tidmore v. Tidmore*, 114 So. 3d 753 (Miss. Ct. App. 2013); and *Schmidt v. Schmidt*, 339 So. 3d 163 (Miss. Ct. App. 2022), which are all distinguishable.  In *Cuccia*, the supreme court cited *Crider*, finding this Court erred in reversing the chancery court's sole custody determination because the chancery court was in the best position to determine if the parents could make joint custody feasible and had found they could not.  *Cuccia*, 90 So. 3d at 1235 (¶¶21-22). *Cuccia*, *Tidmore*, and *Schmidt* each dealt with a modification action, where this Court affirmed the chancery court's change of custody from joint to sole custody because the parents had trouble agreeing or communicating.  However, child-custody-modification actions employ a different standard than initial child custody actions—i.e. whether there has been a material change in circumstances adverse to the children's welfare. *Tidmore*, 114 So. 3d at 760 (¶19).  In *Schmidt*, the parents admitted that their co-parenting relationship had deteriorated and had an adverse effect on the children.  *Schmidt*, 339 So. 3d at 175 (¶36). Here, the chancellor made a specific finding that the joint custody arrangement during the proceedings had not adversely affected the children.

behavior on both sides. Shane correctly claims *Watts* did not find the parents lacked an ability to co-parent, as here. Instead, the father argued on appeal that joint custody was "inappropriate," and in support, he cited instances where the mother had been hostile to him in front of the child. *Watts*, 99 So. 3d at 760 (¶25). However, we do not find this distinction to be of merit. Further, the chancery court's one-sentence cite to *Watts* is not reversible error. Moreover, *Watts* cited *Crider* for the proposition that the chancellor is in the best position to determine if the parents have "the level of commitment" to share joint custody. *Id.* at 761 (¶28).

¶36. Shane points to disagreements between the parties and bad behavior on the part of Andrea, most of which was relayed above. However, even though the record shows communication issues and disputes between the parents over the children, the record also shows many of the disputes, such as over the children's medical care, were minimal. And the more substantial disputes, such as one over the children's education, stemmed from Shane's failure to abide by the court's orders, not an inability to co-parent.

¶37. Further, the chancery court cited evidence in her *Albright*-factor analysis and opinion to support her ruling on joint custody, finding the majority of factors neutral. In sum, both parents were found to be capable and loving parents, whom their sons loved equally. The chancellor found both parents contributed to the primary care of the children throughout the marriage, even though it "ebbed and flowed" as the parties' employment responsibilities changed. Further, both parties shared caretaking responsibility of the children after the initial temporary order and were found capable of doing so. Evidence showed both parents

provided physical and emotional care for their sons, as well as a willingness and capability to provide primary child care. Both parents arranged their work schedules around the children's schedule.[14] Both parents were found to love their sons; have a strong, healthy relationship with them; and provide stable housing. For the moral-fitness factor, the court found Andrea's affair had not had an adverse effect on the children, and both parties were promoting the spiritual growth of the boys.

¶38. Additionally, Shane argues that he should be granted sole physical custody of the children because he was favored on three of the *Albright* factors, while none favored Andrea. It is well established that the *Albright* factors are not to be treated as "a mathematical formula where custody must be awarded to the parent who 'wins' the most factors" but, rather, a guide to determine the best interest of the child. *Edwards v. Edwards*, 189 So. 3d 1284, 1286-87 (¶¶8, 13) (Miss. Ct. App. 2016) (quoting *Lee v. Lee*, 798 So. 2d 1284, 1288 (¶15) (Miss. 2001)). "All the [*Albright*] factors are important, but the chancellor has the ultimate discretion to weigh the evidence the way [s]he sees fit in determining where the child's best interest lies." *Garner v. Garner*, 343 So. 3d 1097, 1107 (¶54) (Miss. Ct. App. 2022) (quoting *Robles v. Gonzalez*, 246 So. 3d 945, 950 (¶21) (Miss. Ct. App. 2018)). Even though Shane was favored in more *Albright* factors than Andrea, the court found the best interest of the child was a joint custody arrangement. Accordingly, this argument is without merit.[15]

---

[14] Andrea's job at the time of trial was as a part-time wound-care management nurse.

[15] Shane complains that Andrea's brief merely "contains nothing more than bare assertions without citation to the record." While true, his contention that, as a result, her

¶39. The separate opinion correctly reiterates the chancellor's findings as discussed above; however, the court decided it was in the best interest of the children to have the extended time with each parent, which would only occur with joint custody. In addition, the court noted that the parties have been traveling under a joint-custody arrangement for over a year, finding it had no evidence of adverse impact on the children. We cannot say the chancery court erred in this regard.

¶40. The chancellor determined that the children needed both parents equally, with extended periods of time with each parent in the children's best interest. The chancellor was in the best position to determine what the children needed. We cannot find the chancery court abused its discretion in awarding joint legal and physical custody of the children to both parents.

## II. Property Distribution

¶41. Shane claims the chancery court erred in awarding an inequitable distribution of marital assets and debts for two reasons: (1) the chancery court failed to account for Andrea's marital fault in its asset division,[16] and (2) the chancery court rendered a property and debt division that was inequitably "lopsided" in favor of Andrea.

¶42. When parties request the chancellor resolve property distribution, "the chancellor

---

argument is procedurally barred and should be stricken under Mississippi Rule of Appellate Procedure Rule 28(a)(7) is not well-taken. As previously stated, while Andrea filed a brief with no meaningful argument as to child custody, we must address the issue of custody for the best interest of the children. *See Briggs*, 396 So. 3d at 1254-55 (¶35).

[16] Here, each party was awarded approximately fifty percent of the value of the marital assets.

must do three things: '(1) classify the parties' assets as marital or separate, (2) value those assets, and (3) divide the marital assets equitably.'" *Burnham v. Burnham*, 185 So. 3d 358, 361 (¶12) (Miss. 2015). "Equitable distribution requires that a chancellor divides marital assets fairly between divorcing spouses." Deborah H. Bell, *Bell on Mississippi Family Law* § 8.05, at 246 (3d ed. 2020). In determining the equitable distribution of marital assets, the chancery court considers the *Ferguson* factors. *Ferguson*, 639 So. 2d at 928.

### A.     *Marital Fault and Property Division*

¶43.    Shane claims the chancery court found Andrea substantially at fault for the deterioration of the marriage but erroneously did not apply this factor in its division of property. We disagree with both claims.

¶44.    "Mississippi is in a minority of states in which marital misconduct is a factor for consideration in property division." *Bell on Mississippi Family Law* § 6.08[2][e], at 193. Under the first *Ferguson* factor, the Mississippi Supreme Court has held that "marital misconduct is a viable factor entitled to be given weight by the chancellor when the misconduct places a burden on the stability and harmony of the marital and family relationship." *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (¶26) (Miss. 2009) (quoting *Carrow v. Carrow*, 642 So. 2d 901, 904-05 (Miss. 1994)).

¶45.    Shane cites several cases in support of his argument where the appellate court reversed the chancery court on property division due to that court's failure to consider marital misconduct, specifically, adultery, in its analysis of the *Ferguson* factors. *See Singley v. Singley*, 846 So. 2d 1004, 1008-09 (¶¶10-13) (Miss. 2002) (reversing chancery

21

court's equal distribution of marital assets while not considering wife's eight affairs in a fifteen-year period that ended the marriage); *Watson v. Watson*, 882 So. 2d 95, 108-09 (¶¶67-68) (Miss. 2004) (reversing chancery court's equal distribution of marital assets when husband began an affair, abandoned the marriage, and moved in with his paramour, all of which destroyed the marriage); *Ellison v. Williams*, 282 So. 3d 447, 451 (¶¶11-12) (Miss. Ct. App. 2019) (reversing the chancery court's sixty-forty percent division of marital assets when the court failed to consider the husband's extramarital affair and absence from the marriage); *Hammond v. Hammond*, 327 So. 3d 173, 175-76, 179 (¶¶1, 16) (Miss. Ct. App. 2021) (reversing the chancery court's nearly equal division of the marital estate which did not consider the husband's marital affair with a foreign paramour that undisputably caused the end of their twenty-five year marriage). These cases are distinguishable; in each one, the level of marital fault due to adultery was quite high. Here, the same cannot be said of Andrea's marital fault.

¶46. Contrary to Shane's claim, the court made no finding that Andrea was substantially at fault for the deterioration of the marriage. The chancellor did, however, unlike the above authority and Shane's assertion, specifically address Andrea's adultery in the first *Ferguson* factor, finding it "caused marital disharmony and contributed toward family instability."[17] However, the court also found that *both* parties contributed to family instability. The court noted that both parties used profanity towards one another, and Shane became unhappy with

---

[17] In the *Albright* findings, the court found Andrea's extra-marital relationship did not have an adverse effect on the children. Photographs entered into evidence show the paramour playing with Andrea and the children at the neighborhood pool, enjoying themselves.

Andrea's spending habits and time spent on trips with her friends.

¶47. Regarding adultery and property distribution, the central question is whether the conduct "impacted and burdened the stability and harmony of the marriage." *Watson*, 882 So. 2d at 108 (¶68) (quoting *Singley*, 846 So. 2d at 1009; *Ferguson*, 639 So. 2d at 928). Here, the record indicates it did not. It is unclear from the record when the affair began, but Shane's testimony below indicates it was around the summer of 2022. However, he did not know about the affair until later,[18] and evidence showed the marriage was rocky in the year before the affair apparently began. We also note Andrea filed for a divorce from Shane first, claiming habitual cruel and inhuman treatment by Shane. A month later, Shane counterclaimed for divorce on the same ground. It was not until approximately six months later that Shane filed a motion to amend his counterclaim to include adultery as a ground for divorce.

¶48. Shane testified that their marriage was "okay . . . outside of . . . typical . . . ups and downs" until they moved to Hattiesburg in 2021, and Andrea acquired new girlfriends. He admitted "the bulk of the downfall of our marriage . . . c[a]me down to finances." He explained that Andrea wanted their lifestyle to "keep up with the Joneses," but they could not afford it. Further, Shane testified that during their two marriage counseling sessions, he stated that he would agree to a divorce if the "stuff that [Andrea] was doing behind closed doors" did not end. He elaborated that this meant "[t]he constant hiding alcohol in the house, withholding sexual feelings, disrespecting me, overspending money, and now we

_____

[18] Shane testified that during counseling, he mentioned that he found out about Andrea's affair that summer, which appears to have been in 2022.

23

found out the affair through the summertime." Shane testified at length about their financial arguments, saying that Andrea "cannot be content with what she has and has had." He also emphasized her drinking too much with her girlfriends and taking trips without him. Shane testified that other reasons Andrea wanted a divorce were that she did not respect him or have feelings for him anymore. Later in the trial, Shane again reiterated that even in mid-2022, the couple was "making our marriage work[, but] the biggest problem was the finance . . . and the alcohol side of it."

¶49. Andrea also admitted that the marriage began deteriorating around May 2021, when they bought the Tidewater house in Hattiesburg. She blamed it on the fact that Shane was traveling to Waynesboro frequently due to work and was never home. Andrea admitted the travel put stress on Shane, as well as a strain on their relationship, because they never saw each other, and she felt like a single parent. They spoke about the problem but found no solution. She testified that he never had time for her or the kids, and "there was no affection." Andrea related that when Shane was home in the evening, he went into his office and traded stocks. Andrea also admitted to their disagreements about money and that Shane became angry about her spending habits starting in 2022. Additionally, Andrea testified that Shane "had stopped working on the marriage" and quit having sex with her. She claimed in marriage counseling that Shane stated he would have divorced her long ago if not for the children.

¶50. The chancellor properly considered Andrea's adultery as a factor in her property distribution, but the evidence in the record did not indicate that Andrea's adultery *caused*

24

the destruction of the marriage but was one of several factors and due to both parties. This issue is without merit.

### B. Division of Marital Property and Debt

¶51. Shane argues this Court should reverse and remand the chancery court's property and debt division because it was inequitable. However, Shane does not contest the chancery court's valuations or classification of the marital property or make distinct arguments about specific property. His main contention is against the award of "negative equity" for the marital property that he claims was caused by the court's "lopsided" assignment of marital debt.

¶52. "[T]he goals of equitable distribution are a fair division of marital property based on the facts of each case and termination of the legal relationship in a manner which each party may realize self-sufficiency." *Seymour v. Seymour*, 960 So. 2d 513, 519 (¶15) (Miss. Ct. App. 2006). However, "an equitable division of property does not necessarily mean an equal division of property." *Chamblee v. Chamblee*, 637 So. 2d 850, 863-64 (Miss. 1994). Instead, "fairness is the prevailing guideline in marital division." *Ferguson*, 639 So. 2d at 929. "As long as *Ferguson* is properly applied, equitable divisions may indeed be lopsided." *Carter v. Carter*, 98 So. 3d 1109, 1113 (¶12) (Miss. Ct. App. 2012). "Debts acquired during the course of the marriage are also subject to equitable distribution." *Id.* at 1114 (¶15). When reviewing the chancellor's findings on the *Ferguson* factors, we do "not conduct a *Ferguson* analysis anew, but review [] the judgment to ensure that the chancellor followed the appropriate standards and did not abuse [her] discretion." *Phillips v. Phillips*, 904 So.

2d 999, 1001 (¶8) (Miss. 2004). "The distribution of marital assets in a divorce will be affirmed if 'it is supported by substantial credible evidence.'" *Lowrey*, 25 So. 3d at 285 (¶26) (quoting *Bowen v. Bowen*, 982 So. 2d 385, 393-94 (¶32) (Miss. 2008)).

¶53. The chancery court awarded Shane marital assets valued at $263,021.50 and Andrea marital assets valued at $256,476.50. The chancery court assigned Shane marital debt totaling $2,825,847 and Andrea marital debt totaling $77,750. Shane now complains that the chancery court "awarded [him] -$2,562,825.50 in negative equity while awarding Andrea $178,726.50 in positive equity." However, his calculations misconstrue the chancery court's findings because the majority of Shane's debt distribution was for PAST LLC.

¶54. First and most importantly, Shane conceded at trial that he was willing to assume all the marital and business debt. When Shane's counsel was summing up what Shane was requesting the court to do, the following exchange occurred with regard to property distribution:

[Shane's counsel]: And you're willing to assume all the marital debt?

[Shane]: Yes, sir.

Q. All the business debt?

A. Yes, sir.

¶55. Further, the chancellor made detailed and comprehensive findings on each *Ferguson* factor. While at first glance, the debt distribution appears inequitable, the evidence shows it was not. The main discrepancy was Shane's being assigned all of PAST LLC's debt of

26

$2,162,152. Shane testified this debt, however, which consisted of numerous bank loans, was integral to running the restaurants and making them profitable. Moreover, the evidence shows Shane was the sole decision-maker for managing PAST LLC's debt.

¶56. It was undisputed that PAST LLC was a marital asset; however, Shane, not Andrea, ran the business. At trial, Shane described his involvement in PAST LLC: "I am the vital part of PAST, LLC. I'm the one that has the wheels going. . . . I create menus, menu diversity, hiring and firing, . . . payrolls. . . . I'm . . . still extremely hands-on with all those aspects of PAST LLC." Even though Andrea and he were shown as equal owners on PAST LLC's corporate filings, Shane testified that Andrea "had no involvement with it."[19] Shane testified at length about how he ran the business, taking out loans to purchase and improve existing restaurants, as well as to fund their running. Shane explained that PAST LLC's debt was for "[b]uildings, equipment, lines of credit, operational funds, food bills" and property loans. Shane admitted that he was the sole decision-maker on incurring and managing the debt on behalf of PAST LLC.

¶57. Shane admits on appeal that PAST LLC is a "revenue-generating asset." Both the parties' personal and PAST LLC's federal tax returns from 2021 were entered into evidence. In 2021, PAST LLC's gross receipts or sales were $1,650,000, minus the cost of goods sold, yielding a total income of $997,782. After deductions, PAST LLC reported an ordinary business income of $113,099. Shane described his salary from PAST LLC as his "consistent

---

[19] Andrea and Shane both testified that she initially worked as a waitress and cook at the first restaurant Shane bought, while she attended nursing school. Andrea testified that she continued to help promote the restaurants and handled "big accounts."

paycheck," not his stocks, which were variable. Shane explained that the restaurants "are not overnight investments. These are long-term investments." He denied his restaurant business was operating at a loss but also claimed it is not a "multi-million dollar industry."[20] Shane described his restaurant business as his "passion." With his complete authority over all decision-making for PAST LLC, it was equitable that the chancery court assign Shane all the debt associated with the business, as well as all the profit.

¶58.    Shane cites three cases in support of his argument where the appellate court reversed the chancery court due to an inequitable distribution of marital property; however, they are distinguishable. In *Davis v. Davis*, 638 So. 2d 1288 (Miss. 1994), the chancery court granted the husband (a dentist) a divorce based on adultery and desertion, awarding him the majority of the marital estate valued at $400,000. *Id.* at 1289. The supreme court reversed, finding the chancellor "ignored or undervalued" the wife's contribution to the joint accumulation of marital assets, regardless of her fault in the marriage. *Id.* at 1293. In *Burham v. Burham*, 185 So. 3d 358 (Miss. 2015), the chancery court almost divided the marital assets equally but assigned all the marital debt (approximately $225,000) to the husband. However, the supreme court reversed, not because the decision was inequitable, but because several of the chancellor's findings were not supported by the evidence. *Id.* at 362 (¶14). Finally, in *Baumbach v. Baumbach*, 242 So. 3d 193 (Miss. Ct. App. 2018), this Court found the chancery court's equal split of proceeds for the sale of the marital home was

_____

[20]    Shane listed on his Rule 8.05 financial statement that his income was $6,165 per month from PAST LLC. *See* UCCR 8.05. He arrived at that salary because he claimed that is what PAST LLC could afford to pay him.

inequitable because the husband was assigned all the marital debt of $700,000, which included a real estate business, and awarded no marital assets. *Id.* at 202, 204 (¶¶27, 33). Further, the husband had made all contributions to the home's mortgage, while the wife lived in the home debt-free and benefited from its equity. *Id.* at 202 (¶27).

¶59. Here, Shane does not argue that the chancery court ignored or undervalued the parties' marital contributions, as in *Davis*, nor does he argue that the chancellor's findings were unsupported by evidence, as in *Burham*; Shane only argues that the chancery court made an improper allocation of marital debt. And finally, Shane's and Andrea's awards of marital assets were nearly equal, unlike *Baumbach*. Excluding Shane's two companies, PAST LLC and Warthorn LLP, as well as the house he bought post-separation, his debt allocation would be only $168,940, with $101,250 of that figure consisting of his seventy-five percent share of the IRS debt. Further, considering the marital house, once sold, the debt on the house would be paid off. We interpret the chancellor's judgment to mean that after the mortgage and closing costs are paid on this transaction, the parties will split any remaining proceeds from the sale of the house. We cannot says the chancellor made an inequitable distribution of marital debt.

¶60. Regarding the disparate tax-liability division of seventy-five percent to twenty-five percent for Shane and Andrea, respectively, for personal federal taxes, the chancery court found that Shane should have the higher percentage because he provided the majority of the parties' accumulation of financial assets. Further, his income was higher than hers. On his Rule 8.05 financial statement, he reported $6,165 in net monthly income, while Andrea

29

reported $1,368.21. This difference also contributed to the property distribution generally, although the chancery court acknowledged Andrea could earn more income than she was with her nursing degree. We find no error.

¶61. The chancery court specifically found that its property distribution would "provide both parties the ability to use those assets along with their income to provide for themselves independent of the other."[21] Under the facts and circumstances in this case, we find no error in the chancery court's distribution of marital property and debt, especially since Shane specifically agreed to take on all of the marital and business debt.

### C. Personal Property

¶62. Finally, Shane claims the chancery court erred "in neglecting to divide several personal property items," and this omission requires reversal.

¶63. In its judgment, the chancery court listed as a marital asset "miscellaneous household goods" with the value as "unknown." Additionally, the court explained in a footnote that "[t]here was no testimony about division of personal property, no listed personal property on the parties' financial disclosure statements and no request for particular items in their post-trial submissions." The court did value and divide the parties' vehicles, as well as their personal checking accounts. The court granted each party the full ownership of the personal property in his or her possession.

¶64. Shane claims, and the record confirms, that at trial, he specifically requested the court

---

[21] We also note in the chancery court's *Armstrong* analysis for alimony, one reason the court denied alimony to Andrea was because Shane was assigned the majority of marital debt.

to award him his tools and three firearms (a Ruger, a P90, and a SIG Sauer collectible military weapon). Shane testified that the first two firearms were registered to him, but the last one was registered to Andrea. Shane testified he bought this weapon at a fundraiser. Shane claims that Andrea told him she pawned the weapons but later told the court she still had possession of them. Shane, however, never submitted any values to the chancery court for this personal property, and the property was not listed on his Rule 8.05 financial statement. Further, he did not call this matter to the attention of the court in any post-trial motions.

¶65. Shane cites *Thompson v. Thompson*, 380 So. 3d 945 (Miss. Ct. App. 2024), as instructive, where this Court reversed on the issue of property division because the chancellor glaringly did not classify or value certain property and did not mention or analyze any of the *Ferguson* factors in its property distribution. *Id.* at 947-48 (¶3). The judgment made no determination whatsoever about any tangible personal property, such as vehicles or checking accounts. *Id.* at 954 (¶34). In the instant case, however, the chancellor properly valued and divided the parties' vehicles and personal checking accounts. The other items were not listed or valued on Shane's Rule 8.05 statement. We cannot say that the chancery court's lack of a determination on Shane's tools and three guns warrants reversal under the circumstances of this case.

## CONCLUSION

¶66. The chancery court did not err in awarding joint legal and physical custody of the children to the parties. Further, the chancery court did not err in its distribution of marital

31

assets and debts.  Finally, the lack of division on four items of personal property not listed or valued on Shane's Rule 8.05 statement was not reversible error.  Accordingly, we affirm.

¶67.   **AFFIRMED.**

**WESTBROOKS, McDONALD, LAWRENCE, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.  WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.  CARLTON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY McCARTY, J.**

**CARLTON, P.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶68.   I dissent in part because I find that the chancellor was manifestly wrong in awarding joint legal and physical custody of the parties' young children given the chancellor's explicit finding that "[Andrea and Shane] are fit [parents,] *yet they do not possess a current ability to co-parent and communicate effectively*." (Emphasis added).  The chancellor's finding on this last point is amply supported by the record.  Upon review, I find that the record is replete with testimony about incidents between Andrea and Shane that plainly demonstrate the hostility and obvious antagonism between them. Indeed, many of these incidents are described in the majority opinion.

¶69.   These incidents include disputes in front of the children involving profane threats, with at least one dispute resulting in a call to law enforcement;[22] times when Andrea

---

[22] For example, the parties had an argument at school drop-off, with Andrea telling Shane, "I'm going to punch you in your f****** face" in front of their son.  Other testimony describes a time when Shane came to pick up one of his sons for his soccer game, and Andrea called law enforcement and attempted to forcibly remove Shane from the marital home in front of the children.

prevented Shane from seeing or communicating with the children for days[23] or prevented

Shane and his family from interacting with the children; times when Andrea left the children

with a babysitter rather than allowing Shane to keep them; and repeated instances

demonstrating the parties' inability to agree on the children's schooling or communicate

regarding other key matters.[24] I find that these incidents overwhelmingly show that Andrea

and Shane are simply unable to effectively communicate, cooperate, and co-parent to such

an extent that a joint custody arrangement is not only contrary to their children's best

interests, but is also wholly impractical.

¶70. Nevertheless, despite this overwhelming evidence and despite her *own* determination

that the parties were unable to co-parent and communicate effectively, the chancellor

awarded joint legal and physical custody of the parties' young children. I find that by

awarding joint legal and physical custody despite this explicit finding, the chancellor

completely ignored the long-standing principle that "unless the parents are capable of

sharing joint custody cooperatively, it is incumbent upon a chancellor *not* to award joint

custody. *This is for the chancellor to determine as he or she is in the best position to*

---

[23] For example, Andrea took the children away for as long as ten days without telling Shane where they were; another time, Andrea instructed day care administrators that Shane was not allowed to pick up their son. Andrea also confirmed during her cross-examination that she caused Shane's cell phone to be disabled, preventing him from being able to attempt to contact the children; and there were times when Andrea completely cut Shane off from communicating with the children for days at a time.

[24] I recognize that the chancellor addressed the parties' "history of disputes" on some of these matters by awarding Shane final decision-making authority on the children's health care and education, but I do not find that this cures the overriding problem created by the chancellor's award of joint legal and physical custody of the children.

*evaluate the credibility, sincerity, capabilities and intentions of the parties.*" *Crider v. Crider*, 904 So. 2d 142, 147 (¶13) (Miss. 2005) (emphasis added); *see, e.g.*, *Morland v. Morland*, 396 So. 3d 501, 508 (¶13) (Miss. Ct. App. 2024) (affirming sole custody to mother where father "demonstrated an unwillingness and inability to achieve the required levels of communication and cooperation for joint legal and physical custody"); *Smith v. Smith*, 379 So. 3d 954, 963-64 (¶27) (Miss. Ct. App. 2024) (finding no abuse of discretion in the chancellor awarding sole custody to father "[g]iven the parties' history, testimony, and demonstrated difficulties co-parenting"); *Garner v. Garner*, 343 So. 3d 1097, 1107-08 (¶59) (Miss. Ct. App. 2022) (affirming sole custody to mother in light of the "substantial evidence in the record that shows [father's] inability to cooperatively share joint custody with [mother]").

¶71. Here, I find that reversal of the chancellor's child custody determination is warranted because the chancellor—the person "in the best position to evaluate the . . . capabilities and intentions of the parties"—made the specific finding that the parties could *not* co-parent and made *no* finding that the parties may be "capable" of doing so. In the face of these circumstances, the chancellor nevertheless chose to award joint custody. I respectfully find that the chancellor manifestly erred in doing so because the record and the chancellor's own finding show that the parties simply do not have the capacity to properly navigate a joint-custody arrangement in this case. For this reason, I would reverse the chancellor's award of joint legal and physical custody and remand this issue to the chancery court for further proceedings consistent with *Crider* and its progeny. *See Robles v. Gonzalez*, 246 So. 3d

945, 952-53 (¶28) (Miss. Ct. App. 2018) (recognizing the supreme court's instruction in *Crider* for a chancellor to find that "the parents are capable of sharing joint custody cooperatively" before awarding joint custody and reversing and remanding the chancellor's child-custody determination where no such determination was made).

**McCARTY, J., JOINS THIS OPINION.**